1  ELIZABETH A. THOMPSON (SBN 112888)
   THOMPSON LAW
2  775 Tenth Avenue
   San Francisco, CA 94118
3  Telephone:    (415) 860-6097
   Facsimile:    (415) 221-4406
4  Elizabeth@ThompsonLawSF.com

5  Attorney for Plaintiffs
   A.P., by and through his father VINCENZO P.,
6  and VINCENZO P. individually

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10

11

12

13  A.P., by and through his father,          Case No.
    VINCENZO P., and VINCENZO P.
14  individually,                             **COMPLAINT FOR VIOLATION OF TITLE
                                              VI OF THE CIVIL RIGHTS ACT OF 1964;**
15              Plaintiffs,                    **VIOLATION OF THE REHABILITATION
                                              ACT OF 1973; VIOLATION OF THE
16         vs.                                AMERICANS WITH DISABILITIES ACT;
                                              BREACH OF WRITTEN CONTRACT;**
17  JESUIT HIGH SCHOOL OF                     **BREACH OF IMPLIED-IN-FACT
    SACRAMENTO, a California corporation,     CONTRACT; BREACH OF THE**
18  JOHN P. McGARRY, S.J., an individual,     **COVENANT OF GOOD FAITH AND FAIR
    and MICHAEL WOOD, Ed.D., an               DEALING; VIOLATION OF THE UNFAIR
19  individual,                               BUSINESS PRACTICES ACT; AND
                                              INTENTIONAL INFLICTION OF**
20              Defendants.                   **EMOTIONAL DISTRESS**

21                                            **DEMAND FOR JURY TRIAL**

22

23

24

25

26

27

28

COMPLAINT

**INTRODUCTION**

1.      By this Complaint, A.P., by and through his father, Vincenzo P., and Vincenzo P. individually seek injunctive relief, damages, restitution, and such other relief as is provided by law to prevent irreparable harm and to remedy injuries caused by discrimination on the basis of race and disability, breach of contract, breach of the covenant of good faith and fair dealing, unfair business practices, intentional infliction of emotional distress, and other violations of law by Jesuit High School of Sacramento ("JHS" or "School"), John P. McGarry, S.J., and Michael Wood, Ed.D.

**JURISDICTION**

2.      This action arises under Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d *et seq.*, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act").

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 because the matters in controversy arise under the laws of the United States. The Court's exercise of supplemental jurisdiction over Plaintiffs' claims under state law is proper, as the state law claims "are so related to [Plaintiffs' claims] that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

**VENUE**

4.      Venue is proper in the Eastern District of California pursuant to 28 U.S.C. §1391(b)(1) and (2).

5.      Defendants reside or are organized in the Eastern District of California, and a substantial part of the events or omissions giving rise to this action arose in the Eastern District of California.

6.      Plaintiffs reside in the Eastern District of California.

///

///

- 1 -

COMPLAINT

**PARTIES**

7.    A.P. is a Mexican American student with learning disabilities.  He has attention-deficit hyperactivity syndrome ("ADHD") and dyslexia, which the School committed to accommodating through a formal written plan.  He is 17 years old.

8.    Vincenzo P. is A.P.'s father.

9.    Plaintiffs A.P. and Vincenzo P. may on occasion herein be referred to collectively as "Plaintiffs."

10.   JHS is an all-boys, independent, Jesuit high school in Sacramento, California.

11.   Plaintiffs are informed and believe and on that basis allege that on or about April 11, 2020, the School accepted a Paycheck Protection Program ("PPP") loan in the amount of $2,326,747 offered under the CARES Act, an economic stimulus bill signed into law on March 27, 2020 in response to the economic repercussions of the COVID-19 pandemic.  By accepting the PPP loan, JHS's activities became regulated by the Small Business Administration's anti-discrimination regulations, which prohibit discrimination on the basis of race, color, religion, sex, handicap, age, or national origin.  13 C.F.R. § 113.3(a).

12.   Defendant John P. McGarry, S.J., is the President of the School.  He exercises substantial control over the School and its operations and is an operator of a place of public accommodation under the ADA.

13.   Defendant Michael Wood, Ed.D., is the School Principal.  He exercises substantial control over the School and its operations and is an operator of a place of public accommodation under the ADA.

14.   Defendants JHS, Principal McGarry, and Dr. Wood may on occasion herein be referred to collectively as "Defendants."

**FACTUAL ALLEGATIONS**

15.   Defendant JHS is a top-tier college preparatory high school.  Admissions standards are rigorous, and 99% of its students go on to college, many to Jesuit colleges and universities and other prestigious institutions.  Having a JHS diploma has always been an important goal for A.P. for that reason, among others.  A Jesuit high school diploma is of especial value when

- 2 -

COMPLAINT

1    applying to Jesuit colleges and universities.

2          16.    JHS has a Student-Parent Handbook ("Handbook") which is periodically updated

3    and distributed to students and their parents.  Students and parents alike are required to agree in

4    writing to abide by its terms as a condition of enrollment in an agreement titled "Foundational

5    Expectations."  The Foundational Expectations agreement provides that:  "THE STUDENT/

6    PARENT HANDBOOK SERVES AS A CONTRACT."  A.P. and his parents have signed such

7    written agreements every year of A.P.'s attendance.  A copy of the Foundational Expectations

8    agreement is attached hereto as Exhibit A.  Because signatures are submitted electronically, a

9    signed copy is not presently available to Plaintiffs.

10          17.    The Foundational Expectations agreement states, "It is essential that students,

11   parents and school officials work together to assure that each student receives a values-based,

12   Christian education."   Likewise, it provides that "Consistent, timely, and open communication

13   among teachers, students, and parents is essential to supporting students in their academic journey

14   while partnering with parents, the student's primary educators."

15          18.    The philosophy that parents are a student's primary educators is a core Jesuit

16   educational principal and is reiterated in the Handbook as well.  Consistent with that philosophy

17   and the Foundational Expectations, A.P.'s parents have taken an active role in his academic and

18   extra-curricular pursuits.

19          19.    The School also takes in its commitment to social justice and non-discrimination:

20                 Jesuit High School admits students of any race, color,
                   national and ethnic origin to all of the rights,
21                 privileges, programs and activities accorded or made
                   available to students at the school. It does not
22                 discriminate on the basis of race, color, national or
                   ethnic origin in the administration of its educational
23                 policies, scholarship and loan programs and other
                   school administered programs. (Student-Parent
24                 Handbook; Foundational Expectations.)
25

26          20.    On or about June 23, 2020, an "open letter" was written to President McGarry,

27   Dr. Wood, Dean of Students LaRoddric C. Theodule, members of the Jesuit Administration, and

28   "the Jesuit community as a whole" regarding racism and racial inequality.  ("June 23 Letter").

- 3 -

COMPLAINT

The letter was signed by five students, who are described as the "main authors."  Given its advanced scholarly analysis and content it is reasonable to assume that the other, anonymous, authors are one or more members of the faculty.  A copy of the June 23, 2020 Letter is attached hereto as Exhibit B.

21.     The June 23 Letter was written following the murder of George Floyd by a Minneapolis police officer, and it advocated for fundamental changes in various aspects of the School's curriculum, policies, and culture.  The proposed changes are based on the highly controversial critical race theory ("CRT").  Teaching CRT has been banned outright in a number of states, and anti-CRT legislation is pending in other states across the country.

22.     Many of the changes proposed in the June 23 Letter were adopted by JHS at the commencement of the 2020-2021 school year.  The letter was read in classes, distributed to the student body, and students were asked to add their signatures to the letter in a show of support.  It was not distributed to parents.

23.     Students were asked in class what they thought of the June 23 Letter, and A.P. shot off saying he thought it was "retarded."  The teacher quickly reminded A.P. that "we are careful with our words."  Nothing else was said, and no discipline was imposed.  While A.P.'s use of the term was inappropriate, he plainly used it as slang to express criticism of the letter.  It was obviously not intended to denigrate a person with an intellectual disability.

24.     A.P. was never asked what it was about the June 23 Letter—which is several pages long and covers a range of topics, including the teaching of Darwinism and the appropriate emphasis on the use of statistics in Math, that he found objectionable.

25.     The students were then instructed to write a response to the student authors of the June 23 Letter on specified topics.  Three of the four topics were designed to elicit a positive response, putting students on notice that only a positive answer would be the right answer:

> Paragraph 1: **gratitude** (1-3 sentences)… what are you grateful for ***about the letter?***
>
> Paragraph 2: **insight** (1-3 sentences), write something that the letter to us made you think that was **new** or **that was deeper** than before.  *You can also share how that insight made you feel.*

COMPLAINT

Paragraph 3: **question(s)** (1-3 sentences), ask a question or two about the letter.  This could be a) something that you want to know more about, b) don't understand, c) disagree with or d) about them personally.  (Remember our class rule:  if you disagree, please ask a clarifying question first.  These often make other people think about their points of view more effectively than a direct challenge).

Paragraph 4: **gratitude part 2** (1-3 sentences), express gratitude for something about the letter again.

(Emphasis in the original.)

26.     In response to these events, a group of parents, alumni, and donors created an informal group called the "Concerned Parents."   The group represents a broad cross-section of the JHS community, including people of color who have children of color, such as A.P.'s parents and the parents of the Black girl who was A.P.'s date at the Homecoming dance.

27.     On October 6, 2020, the Concerned Parents sent its own letter to President McGarry, Dr. Wood, Dean Theodule, the School's Director of Equity and Inclusion, members of the JHS administration, and the School's Board of Trustees ("Concerned Parents Letter").  A copy of the Concerned Parents Letter is attached hereto as Exhibit C.

28.     The Concerned Parents Letter began by commending the School Administration for its prompt response to student concerns about racism and its policy of no-tolerance to racism.  The letter expressed great sadness to have learned some students had experienced racism at JHS.  It then outlined concerns about the lack of parental notification of and involvement in the decision to teach CRT, especially given the Jesuit philosophy that parents are students' primary educators.

29.     The Concerned Parents Letter went on to express substantive disagreement with the tenets of CRT.  Some disagreements were based on religious doctrine.  Others, unrelated to religious doctrine, were directed at the merits of the critical race theory and its inclusion in the JHS curriculum.  One significant point of criticism by the Concerned Parents was that adoption of CRT by JHS implied that the manner in which the parents have taught their children about racism is wrong, which in and of itself is racist.

30.     The Concerned Parents Letter echoed the concern of many CRT critics who believe that rather than fighting racism, CRT fosters segregation, resentment, and division.  One of the oft-

- 5 -

repeated criticisms of CRT is that it is antithetical to Martin Luther King, Jr's vision of "a day when people will not be judged by the color of their skin, but by the content of their character."

31.     The letter expressed dismay that some teachers at JHS were blatantly biased against students who expressed a particular political leaning.

32.     The Concerned Parents Letter ended with a number of suggestions, including an opportunity to gather in person with School officials to discuss how to move forward.  The School agreed, a meeting was scheduled, and an agenda distributed.  But shortly before the date of the meeting, JHS canceled.  It has declined or ignored subsequent meeting requests.

33.     On January 6, 2021, the United States Capitol was stormed and occupied by a mob protesting the 2020 presidential election results.  On January 23, 2021, a Black varsity athlete in his senior year posted the following Instagram, laced with profanity and anti-white racial slurs (username redacted):



COMPLAINT

34.     The Instagram generated yet more controversy, especially given the School's policies against inappropriate language.

35.     The Handbook sternly inveighs against the type of language the Instagram contains, whether it takes place inside or outside of school.  The Handbook warns that violations will subject a student to numerous types of discipline, ranging from detention, probation, exclusion from athletics, co-curricular activities and/or the graduation ceremony, up to expulsion.

36.     Prohibited communications are described as:
- Language or behavior, both implied and explicit, deemed immoral, lewd, scandalous, profane, vulgar, or obscene.
- Language that is inappropriate or demeaning.
- Messages sent or received that indicate or suggest racism.
- Irresponsible emails, text messaging, social networking, and instant messaging.
- Communications that are discourteous, scandalous, rumor-driven, disruptive, threatening, hostile or divisive, including posts to social media or other digital medium. (Handbook; Foundational Expectations.)

37.     However, the student responsible for the Instagram suffered no apparent consequences.  Indeed, he continued to participate in varsity athletics, and he walked across the stage to collect his diploma in the graduation ceremony at the end of the school year.

38.     On April 23, 2021, A.P., then a high school junior, was gathered with a group of approximately 50 other JHS students for an athletic event.  On May 4, 2021, almost two weeks later, he was confronted unexpectedly by Dean LaRoddric Theodule and accused, for the first time ever, of using the "N-word" and calling another student "fag" while at the event.

39.     Dean Theodule said another student had accused A.P. of using those terms, but the Dean would not identify the other student.  Nor did the School ever acknowledge, much less agree to consider statements from other students that contradicted what Dean Theodule reported being told.

40.     A.P. was caught off guard, very upset, and had difficulty responding to Dean Theodule's on-the-spot accusations.  As is known to School officials—it being the subject of extensive documentation and special accommodations—A.P.'s ADHD and dyslexia impair his ability to absorb and respond to information given orally and interfere with his working memory.

COMPLAINT

41.     Initially, A.P. was uncertain what Dean Theodule was talking about, but when he realized it was the event two weeks prior and had a moment to think about it, he acknowledged that he another student had jokingly called each other "fag."  (The other student was ordered to write a letter of apology to the coach, and the matter was dropped.)  When asked about the racial slur, A.P. was adamant that he had never directed the term at or used it to refer to a person.

42.     A.P. had never before been accused or disciplined for using racial or homophobic slurs.

43.     On May 5, 2021, A.P. was told not to attend classes until a formal hearing was held on the alleged disciplinary infraction.

44.     A hearing before the Discipline Board was held on May 12, 2021.  It was conducted via zoom and consisted of A.P. being interrogated non-stop for an hour and 20 minutes by three school administrators, and eventually being reduced to tears.  He admitted and apologized profusely for using the term "fag," even as  a joke with his friend.  He again adamantly denied directing the N-word at or using it to refer to a person.

45.     Withstanding a hostile cross-examination by multiple persons for that long would be a challenge for most resilient adults to manage; subjecting a teenager with ADHD and dyslexia to such an ordeal was abusive and discriminatory.

46.     When the group interrogation came to a halt, A.P. had a break of approximately five minutes.  Dr. Wood, one of the members of the Discipline Board, resumed the interrogation by planting his fists on the table and forcefully asking A.P. what he should do if he were really sorry about something.  A.P. responded that he would apologize, say he was sorry, and fix his wrong.  Dr. Wood said "no" and forcefully asked the question again.  A.P. repeated his answer and added that he would go to church if it was a serious wrong.  Dr. Wood then thrust his face into the camera, saying loudly:  "No!  Penance!  Penance!  Penance!"

47.      Dr. Wood next asked A.P. to identify his sin, and A.P. responded that he hurt someone's feelings.  Dr. Wood said "no" and told him to try again.  Exhausted and stripped of dignity, A.P. gave the same answer, adding that he wasn't sure want Dr. Wood was trying to ask him.

COMPLAINT

48.     Dr. Wood again planted his fists on the table, stared into the camera and declaimed: "Your sin is racism.  You are a racist and a bigot!"  He said angrily that the School had been working on racism all year, and he referenced the June 23 Letter (calling it "the student-to-student letter") and said it "got the parents all upset."

49.     The following day, May 13, 2021, Dr. Wood telephoned A.P.'s mother and told her that the Discipline Board had ruled against A.P., and that he would not be allowed to continue attending JHS.  The stated reason for the discipline was A.P.'s purported combination of racial slurs, homophobic slurs, and other unstated conduct.  Dr. Wood also expanded the number of purported accusers from a single student, as reported by Dean Theodule, to an unspecified number of multiple students (again unnamed).  He added that it was not just the alleged incident on April 23, but that the School had previously documented A.P. engaging in such misconduct, and that intervention by the School had not resulted in changed behavior.

50.     Other that the quick verbal rebuke by a teacher for saying "retarded," A.P. had never before been warned or counseled about other similar purported misconduct, nor do his written school records contain a scintilla of evidence documenting any such past misconduct, counseling, or discipline.

51.     Dr. Wood said A.P. could withdraw from JHS as the situation did not justify outright expulsion, and A.P. would be allowed to complete his junior year based on his grades in progress.  Dr. Wood then added that "Withdrawn – Discipline" would be added to A.P.'s transcript.

52.     He tried to convince A.P.'s mother that the notation of withdrawal with discipline was proof that JHS did not intend to interfere with A.P.'s education.  He said an agreed withdrawal on that basis would demonstrate to a recipient of the transcript that there had been cooperation between the parties about the reasons for the withdrawal.

53.     Dr. Wood acknowledged that the annotation on A.P.'s transcript could well raise questions, but if A.P. "told the truth" and agreed with JHS's description of the reason for the withdrawal, it "should" not harm his prospects.

54.     In other words, because A.P., himself a person of color, and his parents have

- 9 -

questioned or disagreed with CRT (along with many others who believe it is counter-productive and actually promotes racism), he has been stigmatized as a racist, a bigot, an unrepentant sinner and is being forced to withdraw from the School.

55.    A.P.'s mother asked Dr. Wood if was fully aware of A.P.'s disabilities.  Dr. Wood paused, clearly taken aback, and then said he was aware that A.P. had ADHD but it was irrelevant to the situation.

56.    In short, if A.P. and his parents fall into line and pretend A.P. deserves what happened to him—which they do not—JHS will do nothing further to harm A.P.'s educational prospects.

57.    Despite Dr. Wood's assurances to the contrary, the potential for irreparable harm to A.P.'s future if JHS issues transcripts to colleges and universities, especially Jesuit colleges and universities, showing that he withdrew at the end of his junior year with discipline pending is obvious and extreme.

58.    A.P.'s parents protested the decision to President McGarry, to no avail.  They pointed out the obvious inequality of disciplining A.P., severely, based on the allegations of a single, unnamed student and a contrived history of similar conduct, while three months earlier the School allowed public commentary from a Black student which was laced with a stream of racially charged, profanity-laden invective, in which the other student accused "you white mfs" of being proof that "White privilege is fuckin real."

59.    In contrast, A.P., a non-Black student never before accused of making racist or homophobic comments, was harshly punished for purportedly doing so on a single occasion, combined with allegedly having a previously undisclosed, documented, history of such comments, and an unthinking comment made in a class—notably in response to the June 23 letter.

60.    A.P.'s parents also protested the abusive manner in which A.P. had been treated throughout the disciplinary process, especially at the hearing, as disability discrimination.

61.    They further protested on the ground that JHS has an extensive system of progressive discipline, and at worst, assuming A.P. truly had a history of misconduct, that it would justify disciplinary probation:

COMPLAINT

Disciplinary Probation is for those students who have not
shown improvement in conduct after warnings from the
Dean or have been involved in a serious offense against
school policy. Students placed on Disciplinary Probation
will receive a contract that must be signed by their parents.
Students on Disciplinary Probation will not be allowed into
class until the Dean has received the signed contract. At the
conclusion of each semester, the behavior of those students
who are on Disciplinary Probation is reviewed. Jesuit High
School then determines whether to rescind the probation,
continue the probation, or dismiss the student if his
behavior or attitude has not improved. (Student-Parent
Handbook.)

62.     The treatment of A.P. throughout the disciplinary process was abusive and
discriminatory.  He was subjected to extreme discipline for allegedly using offensive language, in
contrast to a Black student whose undisputed, public use of profanity and racist language—used
by the Black student to prove the existence of the controversial, foundational CRT concept of
white privilege—was tolerated.

63.     A.P. has suffered severe and enduring emotional distress due to Defendants'
treatment of him.  He was suddenly confronted, accused, and questioned without warning about
his conduct at an event two weeks earlier; he was not allowed to return to class with his peers; he
was subjected to hostile cross-examination by school authorities for an hour and 20 minutes,
culminating with the school principal humiliating him by labeling him a bigot, a racist, and an
unrepentant sinner; he was given no opportunity to improve his conduct; he was peremptorily and
unfairly denied the ability to finish high school with his friends of many years; his known
disabilities were dismissed as irrelevant; the School is endangering his college prospects by
refusing to release his transcript without the annotation that he withdrew with discipline; and after
allegedly engaging in the same type of misconduct as a Black student, A.P. was subjected to
discrimination and abusive treatment to which the other student was not.

64.     The cumulative effect of these events has been traumatic and has caused extreme
and enduring emotional distress and necessitated professional counseling.

///

///

- 11 -

**FIRST CLAIM FOR RELIEF**

**Violation of Title VI, 42 U.S.C. § 2000d *et seq.***
**alleged by A.P. against JHS**

65.     Plaintiff incorporates the preceding paragraphs of this Complaint as though fully set forth herein.

66.     JHS intentionally discriminated against A.P. by subjecting him to discipline and abusive treatment to which Black students are not subjected.

67.     JHS intentionally discriminated against A.P. because he and his parents questioned the tenets of CRT and JHS's incorporation of CRT into the School curriculum.

68.     JHS intentionally discriminated against A.P. and continues to so by refusing to release his official school transcript unless he and his parents agree that he is a bigot and a racist.

69.     As a result of JHS's violations of Title VI of the Civil Rights Act of 1964, A.P. has suffered and will continue to suffer great and irreparable harm, justifying injunctive relief and awards of general and punitive damages in amounts to be proven at trial.

**SECOND CLAIM FOR RELIEF**

**Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**
**alleged by A.P. against JHS**

70.     Plaintiff incorporates the preceding paragraphs of this Complaint as though fully set forth herein.

71.     A.P. is a qualified individual with disabilities within the meaning of Section 504 and is qualified to participate in or receive benefits from Defendant's programs or activities. 29 U.S.C. § 794(a).

72.     Because of the nature of his alleged misconduct, the School refused to provide reasonable accommodations and instead dismissed A.P.'s disabilities as irrelevant.

73.     As set forth above, JHS's policies and practices discriminated and continue to discriminate against A.P. on the basis of disability.

74.     As a result of JHS's violations of Section 504, A.P. has suffered and will continue to suffer great and irreparable harm, justifying injunctive relief and awards of general and punitive

- 12 -

1  damages in amounts to be proven at trial.

2  **THIRD CLAIM FOR RELIEF**

3  **Violation of the Americans With Disabilities Act, 29 U.S.C. § 12101, *et seq.*
alleged by A.P. against all Defendants**

4  75.    Plaintiff incorporates the preceding paragraphs of this Complaint as though fully

5  set forth herein.

6  76.    A.P. is a qualified individual with disabilities within the meaning of the ADA.

7  77.    Because of the nature of his alleged misconduct, the School refused to provide

8  reasonable accommodations and instead dismissed A.P.'s disabilities as irrelevant.

9  78.    As set forth above, JHS's policies and practices, and the actions and inactions of

10  McGarry and Wood, discriminated and continue to discriminate against A.P. on the basis of

11  disability.

12  79.    Defendant McGarry had the authority to decide whether A.P. should be disciplined,

13  and if so, how he should be disciplined.  Defendant McGarry has the authority to decide whether

14  A.P.'s transcript can be released without stating that A.P.'s forced withdrawal was due to

15  discipline.  He is thus an operator of a public accommodation under the ADA.

16  80.    Defendant Wood had the authority to decide whether A.P. should be disciplined,

17  and if so, how he should be disciplined.  Defendant Wood has the authority to decide whether

18  A.P.'s transcript can be released without stating that A.P.'s forced withdrawal was due to

19  discipline.  He is thus an operator of a public accommodation under the ADA.

20  81.    As a result of Defendants' violations of the Americans With Disabilities Act, A.P.

21  has suffered and will continue to suffer great and irreparable harm, justifying injunctive relief and

22  awards of general and punitive damages in amounts to be proven at trial.

23  **FOURTH CLAIM FOR RELIEF**

24  **Breach of Written Contract alleged by All Plaintiffs against JHS**

25  82.    Plaintiff incorporates the preceding paragraphs of this Complaint as though fully

26  set forth herein.

27  83.    At all times relevant hereto, the relationship of A.P., his parents, and JHS was

28  governed by the Foundational Expectations agreement and Handbook, promising:  (a) that JHS

- 13 -

COMPLAINT

would partner with parents, the students' primary educators, in all facets of student life at JHS; (b) that A.P. would be treated fairly and not discriminated against on the basis of race or disability; (c) that A.P. would be treated with respect and dignity; (d) that discipline would not be imposed in a manner that was capricious, arbitrary, or retaliatory; (e) that parents would be notified of any significant discipline issues; (f) that progressive discipline would be employed and A.P. would be given the opportunity to improve any alleged misconduct; (g) that JHS would accommodate A.P.'s disabilities, not ignore them when considering disciplinary action; and (h) that being educated at JHS would enhance, not cause irreparable harm, to A.P.'s college prospects.

84.    Plaintiffs have performed all conditions, covenants, and promises required of them under the contract with JHS, except to the extent performance has been excused or prevented by JHS.

85.    As a result of Defendant's breaches of contract, Plaintiffs have suffered and will continue to suffer losses justifying awards of general and special damages in amounts to be proven at trial.

**FIFTH CLAIM FOR RELIEF**

**Breach of Implied-in-Fact Contract alleged by All Plaintiffs against JHS**

86.    Plaintiffs incorporate the preceding paragraphs of this Complaint as though fully set forth herein.

87.    An implied-in-fact contract may be created by the parties through a combination of spoken and written words, conduct, interactions, and the overall circumstances of their relationship.

88.    Factors demonstrating the existence of an implied-in-fact contract between a student, the students' parents, and a school include:  the policies and practices of the school; the student's length of attendance, grades, accomplishments, and participation in school activities; the existence, nature and severity of any student discipline; and the student's attitude towards and compliance with the school's expectations.

89.    Additional factors demonstrating the existence of an implied-in-fact contract include parental participation, financial support, and support of the mission, purpose, policies, and

COMPLAINT

practices of the school.

90.     At all times relevant hereto, the words, relationship, and entire course of conduct between A.P. and the School created an implied-in-fact contract providing:  (a) that the School would partner with parents, the students' primary educators, in all facets of student life at JHS; (b) that A.P. would be treated fairly and not discriminated against on the basis of race or disability; (c) that A.P. would be treated with respect and dignity; (d) that discipline would not be imposed in a manner that was capricious, arbitrary, or retaliatory; (e) that parents would be notified of any significant discipline issues; (f) that progressive discipline would be employed and A.P. would be given the opportunity to improve any alleged misconduct; (g) that JHS would accommodate A.P.'s disabilities, not ignore them when considering disciplinary action; and (h) that being educated at JHS would enhance, not cause irreparable harm, to A.P.'s college prospects.

91.     Plaintiffs have performed all conditions, covenants, and promises required of them under the implied-in-fact contract with JHS, except to the extent performance has been excused or prevented by JHS.

92.     As a result of Defendant's breaches of contract, Plaintiffs have suffered and will continue to suffer losses justifying awards of general and special damages in amounts to be proven at trial.

## SIXTH CLAIM FOR RELIEF

### Breach of the Covenant of Good Faith and Fair Dealing
### Alleged by all Plaintiffs against JHS

93.     Plaintiffs incorporate the preceding paragraphs of this Complaint as though fully set forth herein.

94.     Plaintiffs and JHS entered into express and implied-in-facts agreements.

95.     Plaintiffs performed all, or substantially all of the significant obligations required by them, except to the extent performance has been excused or prevented by JHS.

96.     JHS prevented Plaintiffs from receiving the benefits to which they were entitled under the contracts.

97.     JHS did not act fairly and in good faith under the parties' express and implied-in-

COMPLAINT

facts agreements.

98. As a result of Defendant's breach of the covenant of good faith and fair dealing, Plaintiffs have suffered and will continue to suffer losses justifying awards of general and special damages in amounts to be proven at trial.

### SEVENTH CLAIM FOR RELIEF
**Unfair Business Practices, Cal. Bus. & Prof. Code § 17200**
**Alleged by All Plaintiffs against JHS**

99. Plaintiffs incorporate the preceding paragraphs of this Complaint as though fully set forth herein.

100. JHS's business practices as alleged herein are unfair, oppressive, and illegal.

101. JHS's business practices offend the public policy of the State of California.

102. The harm caused by JHS's business practices outweighs any benefits accruing from such actions.

103. As a direct, foreseeable, and proximate result of JHS's acts and omissions, Plaintiffs have suffered and will continue to suffer great and irreparable harm, justifying injunctive relief and restitution for their losses in an amount to be proven at trial.

### EIGHTH CLAIM FOR RELIEF

**Intentional Infliction of Emotional Distress alleged by A.P. Against All Defendants.**

104. Plaintiffs incorporate the preceding paragraphs of this Complaint as though fully set forth herein.

105. Defendants' conduct as alleged herein was outrageous.

106. Defendants intended to cause, or acted with reckless disregard of the probability of causing A.P. to suffer emotional distress;

107. A.P. has suffered severe emotional distress;

108. Defendants' conduct was a substantial factor in causing A.P.'s severe emotional distress.

109. Plaintiff has suffered and will continue to suffer losses justifying awards of emotional distress and punitive damages in amounts to be proven at trial.

///

- 16 -

COMPLAINT

1

**PRAYER FOR RELIEF**

2

WHEREFORE, Plaintiffs pray for judgment as follows:

3

1.     Injunctive relief;

4

2.     General and special damages;

5

3.     Emotional distress damages;

6

4.     Punitive damages;

7

5.     Restitution; and

8

6.     Such other and further relief as the Court deems just and proper.

9

DATED:  July 29, 2021                          THOMPSON LAW

10

*/s/ Elizabeth A. Thompson*

11

ELIZABETH A. THOMPSON
Attorney for Plaintiffs A.P. and

12

VINCENZO P.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 17 -

COMPLAINT

Exhibit A



## FOUNDATIONAL EXPECTATIONS

### APPROPRIATE CONDUCT OF A JESUIT HIGH SCHOOL STUDENT/PARENT

As a necessary condition of continued enrollment, students must behave in a manner, both on and off campus, that is consistent with the principles and philosophy of Jesuit High School. These principles include, but are not limited to, any policies, principles or procedures set forth in our Student-Parent Handbook. It is also a condition of enrollment that the parent/guardian of each student conform to these standards of conduct as determined by Jesuit High School.

It is essential that students, parents and school officials work together to assure that each student receive a values-based, Christian education. Normally, philosophical differences between families and the school can be resolved. In some rare instances, however, Jesuit High School may find it necessary, at its discretion, to require parents/ guardians to withdraw their son from the school.

Our school community's expectations include the following:

1. Just as the school expects its faculty and staff to be respectful of our students and parents/ guardians, Jesuit expects parents/guardians and students to work courteously and cooperatively with the school in order to assist each student in meeting the academic, moral and behavioral expectations of the school. This includes respectful treatment of all faculty, coaches, moderators, counselors, administrators, support staff, other students and other parents;

2. Students and parent/guardians are encouraged to express their concerns about school opera- tions and personnel to the appropriate administrators and staff; however, they may not do so in a manner that is discourteous, scandalous, rumor-driven, disruptive, threatening, hostile or divisive, including posts to social media or other digital medium.

3. These behavioral expectations for students and parents/ guardians include, but are not limited to, all school-sponsored events (e.g., athletics, field trips, etc.) as well as interaction with school staff, other Jesuit students, and parents at any other time.

4. In the event that a dispute arises between Jesuit or its officers and an active student and/or his family that results in legal action in the form of litigation, Jesuit may choose to terminate the student's enrollment contract and require that the student be withdrawn from Jesuit.

Jesuit High School reserves the right to determine, at its discretion, which actions fail to meet the principles and Christian philosophy of the school. Failure to follow these guidelines may result in a warning, disciplinary action short of dismissal, a suspension of a student and/or parent /guardian's privilege to attend or to participate in school activities, or dismissal depending on the severity of the offense.

3

## FOUNDATIONAL EXPECTATIONS *continued*

### HARASSMENT POLICY

Jesuit High School is committed to providing a learning environment that is free from harassment in any form. Harassment or intimidation of any student (or any staff member, guest, volunteer, or students from another school) by a Jesuit student, a parent/guardian, a school employee, a volunteer or a vendor will not be tolerated.

Harassment occurs any time an individual is subjected to treatment by another or by a school environment that is hostile, offensive or intimidating, regardless of when or where such an action takes place. The nature of harassment may pertain to, but not be limited to, an individual's race, creed, color, national origin, culture, gender, appearance, mannerisms, sexual orientation, physical or mental disability. Encouraging or taunting others into misconduct is considered a violation of the school's harassment policy.

A charge of harassment shall not, in and of itself, create the presumption of wrongdoing. However, substantiated acts of harassment will result in disciplinary action up to and including the dismissal of a student and, for an employee, immediate termination.

The school will treat allegations of harassment seriously and will investigate all allegations in a prompt, confidential and thorough manner. Students found to have filed false and/or frivolous charges will also be subject to disciplinary action, up to and including dismissal.

### MEDIA/PUBLICATIONS

Jesuit High School is proud of the positive activities, honors and achievements of our students. As a result, we make every effort to promote these accomplishments through such vehicles as our local newspapers, radio and television stations, and through school publications as well as our website and social media accounts. On occasion, Jesuit students may be interviewed, named, photographed and/or filmed for use in school publications, school-related websites, social media, videos, newspapers, and on-air and digital media outreach.

### NON-DISCRIMINATION AS IT APPLIES TO STUDENTS AND EMPLOYEES

Jesuit High School admits students of any race, color, national and ethnic origin to all of the rights, privileges, programs and activities accorded or made available to students at the school. It does not discriminate on the basis of race, color, national or ethnic origin in the administration of its educational policies, scholarship and loan programs and other school administered programs.

Likewise, Jesuit High School does not discriminate against any applicant for employment on the basis of race, color, national or ethnic origin, marital status or gender.

## THE STUDENT/PARENT HANDBOOK SERVES AS A CONTRACT

All students, along with their parent(s)/guardian(s), explicitly accept the provisions set forth in the current Student-Parent Handbook as a condition of enrollment at Jesuit High School and agree, so far as they may be applicable and not at variance with any of the provisions of this contract, to comply with all school regulations.

Jesuit High School reserves the right to amend the Student-Parent Handbook at any time, should the need arise. Any policy statements published during the course of the school year are considered to be an addendum to the Student-Parent Handbook. The policies stated in the Student-Parent Handbook shall prevail should inconsistencies be found with the published policies in other Jesuit High School publications.

## VOLUNTARY ASSOCIATION

Enrollment at Jesuit High School is considered to be a privilege. Enrollment is also a voluntary association between the student and the school. As such, the relationship can be terminated at any time and for any reason, either by the parents/legal guardian of the student or by the school administration.

## PROFILE OF A JESUIT HIGH SCHOOL GRADUATE AT GRADUATION

- Open to Growth: By instilling a joy in learning, each graduate will continue his own growth process long after he leaves Jesuit High School. He will seek opportunities to develop his own mind, body, imagination, feelings and religious consciousness.

- Intellectually Competent: A graduate will have mastered fundamental academic skills and have the knowledge, awareness, critical thinking skills and intellectual integrity to succeed in college and be prepared for leadership in service.

- Religious: He will have a basic knowledge of Christianity and Catholic doctrines and practices. He will be developing strong, moral reasoning skills. He will be coming to understand that faith in Jesus calls one to live as a person for others.

- Loving: He will begin to know and accept himself as being loved by others and being personally known and loved by God. He will begin to see and understand obstacles to human growth in the world, such as prejudice, while recognizing the ability of people and structures to change.

- Committed to Doing Justice: He will have a growing understanding of injustice and its sources in the world and begin to see that Christian faith demands an active commitment toward fostering a just society. He will have acquired skills, such as an understanding of government and public policy, and the motivation to use his skills for the benefit of humanity.

The Jesuit High School experience does not end with graduation. Our goal is to inspire and enable graduates to put their values into action with an active life of service for humanity, for the greater glory of God.

## CARPOOL POLICY—ARRIVAL, DROP-OFF, PICK-UP

*Please note that for the 2020-21 school year, it is recommended that students do not carpool with anyone outside of their household in an effort to mitigate the spread of Covid-19*

When local health regulations suggest Carpools are safe, carpools are strongly encouraged as an efficient and ecologically sound way to transport students to and from school.

Parents should drop off students by using the O'Donnell Drive entrance off of Fair Oaks Blvd or the campus side of American River Drive near the student parking lot.

1. Please try to "drop off " students at least twenty (20) minutes before school.
2. Please do not arrive to "pick up" students until at most twenty (20) minutes before dismissal.
3. Please make sure that your son is waiting for you and that you do not block the loading zone waiting for him.
4. Students are not allowed to wait at any other off-campus location.
5. Please remember that Jesuit is a school zone and drive at a safe and legal speed.
6. Parents must follow the direction of security personnel at all times.

## COMMUNICABLE DISEASES POLICY

*Jesuit High School has created a Safe Return Plan in response to the COVID-19 pandemic that can be used for guidance on a range of communicable diseases.*

To ensure the safety, health and welfare of the entire Jesuit High School community, the administration will require or recommend appropriate forms of isolation and nonattendance at classes or on the campus. Isolation means that the student must stay home until fully recuperated. Non-attendance at classes or on the campus means that with certain communicable diseases, the individual may not attend class or be on campus without a medical release from a physician. With other less serious communicable diseases, it is recommended that the student not attend class or be on campus.

## CONFLICT RESOLUTION

Consistent, timely, and open communication among teachers, students, and parents is essential to supporting students in their academic journey while partnering with parents, the student's primary educators. Jesuit High School utilizes various communication platforms that support quality communication (see the Academics section for more detail about these platforms).

Inevitably, situations arise where greater clarity is needed or where a conflict arises that requires resolution among the school, the parents, and the student. In order to promote consistent communication, to allow decisions and situations to be resolved at the proper level, and to promote the development of quality communication skills for students, Jesuit implements the following process for communication and conflict resolution.

## GENERAL STUDENT INFORMATION *continued*

In almost all instances, Jesuit asks that students are the first to communicate with a teacher/coach/ moderator when there is a need for a resolution, clarification, or further dialogue. If the student does not feel the question or concern is resolved as a result of the initial outreach, the student's parents should reach out to the teacher/coach/moderator.

Jesuit High School realizes that some students may need extra support in crafting a message or preparing to talk to a teacher/coach/moderator and we encourage parents to work with their sons if needed. In other cases, it may be necessary for a parent to reach out first if the circumstances require. In these cases, it is important for parents to note the circumstances preventing the initial student initiated contact.

If, after the student and the parents have attempted to find a resolution through direct contact with the appropriate teacher/coach/moderator, then we ask that the parent contact the appropriate supervisor (see chart below). If a family does not attempt to find resolution with the appropriate person at the proper level, the school will ask that this inquiry be redirected before being considered by the supervisor.

The school also realizes that there are times when the concern or conflict requires that the supervisor is contacted first. In these cases, it is important for the student or parent to note the circumstances preventing the initial communication to the teacher/ coach/ moderator.

We must be sure to make a distinction between issues of clarification or conflict resolution and issues of a student's well-being or safety. Students and parents can and should reach out to any adult on campus at any time if they are concerned a student may be in danger of harm by others, a harm to himself, or a harm to others. Also, any disciplinary issues should be reported to the Dean's Office directly.

Process in elevating a concern:

### I. Academic/Classroom concern
First:   Teacher
Then:   Department Chair
Then:   Supervising Assistant Principal for the Department
Then:   Assistant Principal for Academics
Finally: Principal

### II. Athletic concern
First:   Coach
Then:   Head of Program
Then:   Athletic Director
Then:   Assistant Principal for Student Life
Finally: Principal

**III. Co-Curricular concern**
First:   Moderator of the Activity
Then:   Program Director (Activities, Service and Justice, Campus Ministry)
Then:   Assistant Principal for Student Life
Finally: Principal

Teachers, Staff, and Administrators are expected to respond to all emails within 24 hours not including weekends or holidays.

## DANCES

Jesuit, Christian Brothers, Cristo Rey and St. Francis High Schools hold age-appropriate dances throughout the school year. All four schools have accepted a common set of expectations and practices to help provide the best possible environment for healthy social interaction between the schools.

The Catholic High Schools of the Sacramento Diocese have a "no limousine" policy and do not allow limousines to deliver students to our dances (on or off-campus) or wait on our grounds. This policy also extends to RVs.

1. Dances are normally held from 7:00-10:00 p.m. No students will be admitted after **8:00 p.m.** and no students may leave before 9:30 p.m. ***Any student left at the dance without a ride home beyond 30 minutes after the scheduled end time is subject to a taxi ride home at the parent's expense.***

2. All students must show a current Student Body Card at the door in order to enter the dance.

3. Tickets may only be purchased in advance at school.

4. Jesuit's non-date dances are open to Catholic high school students only. At certain designated open dances, Jesuit students may bring one guest from a public high school by completing a Guest Pass Request Form and returning it to the Activities Office for approval by the end of the last school day prior to the dance. This request requires the signature of the guest's parent along with an emergency contact number. Both the Jesuit student and the public-school guest must present a current and valid Student Body ID Card at the door. High school graduates may attend at the discretion of the Dean and they must have completed a Guest Pass; guests cannot be over 20 years of age. If any problems arise due to that guest's presence at a Jesuit dance, the Jesuit student will assume full responsibility.

5. Jesuit's date dances (Homecoming, Junior Prom and Senior Ball) are open to Jesuit High School students and their dates. Jesuit High School students may bring a guest from any school provided they complete the Guest Pass. A Jesuit High School student may also attend a date dance without a date and may purchase an individual bid at a reduced rate.

6. Jesuit reserves the right to conduct random and selective Breathalyzer testing at any and all school events including dances. Detection canines may be used to survey cars and bags for contraband. (See Drug / Alcohol Policy, p. 28.)

Exhibit B

Dear students of Jesuit High School,

The Office of Equity and Inclusion is inviting the Jesuit student body to join the campus community in anti-racist practices.  In addition to faculty education on understanding identity and racism, your fellow peers have created a document outlining specific actions on how our community can become an equitable and inclusive campus.

Below you will find an introduction from the main authors of the document, a Google Form link where one can read and have the option to sign the document.  If you have any questions or concerns please feel free to contact the Office of Equity and Inclusion.

Thank you,
Jordan Brown
Director of Equity and Inclusion

---

Our fellow Marauders,

Today we humbly write to you to continue discussing and recognizing racism. Racism has created a chronic impact on our community and the time has come for it to be properly addressed.

As men for and with others, it is imperative that we come together to resist racism through the recognition of the natural right that every person deserves justice and equality.

Back in June, five of us sat down and wrote an open letter to our Jesuit community about our observations on how racism and injustice has been a part of our school environment. This letter details our frustrations, hopes, concerns, and ideas; we would like to share our letter with all of you to start conversations, inspire change, and create an overall better environment on our campus.

Whether you are a fellow student, alumni, parent, teacher, or concerned member of the Jesuit community, we are all equal in the eyes of God, thus we implore you to find yourself within this letter and support your brothers, sons, and students, by signing below.

For the greater glory of God,
Matt Parks '21, George Sicner '21, Alonso Lee '22, Adam Sherif  '22, Tommy Contreras '22

June 23, 2020

Dear President McGarry, Dr. Wood, Dean Theodule, members of the Jesuit Administration, and the Jesuit community as a whole:

Over the past few weeks, a national conversation has exploded over the topics of racism and racial inequality following the inexcusable death of George Floyd. In response to the social strife and unrest that our country is facing caused by racial inequity, we feel compelled to take action that addresses the difficulties within our own community at Jesuit High School.

As Jesuit students, we have been taught to question the status quo, and when something is wrong, to redress it. This pertains to all of us — students, teachers, administrators, parents, all members of our community — as to avoid the culture of complicity that allows behaviors and "norms" to go unchecked. We write to you today to advocate for changes in our community and curriculum that we feel are necessary so that our school reflects the many voices of our world.

Our mission statement states that we are "dedicated to forming competent young men into conscientious leaders in compassionate service to others for the greater glory of God." It is imperative that we remember this mission.

As a part of our faith, we are taught to respect all people, and that all God's creations were created in His own likeness. However, the experience of being treated with kindness, respect, and love is not a universal equality for many individuals at Jesuit High School.

In regards to the current culture at Jesuit, over the past fews weeks, many students have voiced some overarching concerns about how racism has led to the isolation of members within our school community. This theme of isolation and inequality was a prevalent topic at many of the ongoing school-administered listening sessions. Sadly, identity-based discrimination and racism have become an everyday occurrence on our campus. Racial slurs and other forms of racial profiling have become the norm. The throwing around of the word "gay" or the "N-word" have become common words that are used to refer to someone as stupid or weird. Many students make racist comments and jokes that are tragically accepted as a form of joking. This "joking" is made at the expense of others and there needs to be more of a strict guideline to prevent it.

Addressing racism and instances of racist sentiment need to be prioritized just as much as the regulation of drug use, for it is through these sentiments and experiences that people in our school community become isolated from other individuals. We believe that a zero-tolerance policy towards racism and homophobia on campus should be instituted to ensure the well-being of all individuals. The following suggestions are offered.

Establish clear school policies and reinforce goals — Standardized anti-bullying rules must be made clear to students as well as the repercussions of such actions. Students should be informed at the beginning of the year (at either school-wide or class assemblies) with visual reinforcements on campus.

Be public and purposeful about being inclusive — It is important that everyone in the Jesuit community knows that the school is a safe place where all students are welcome and that hateful words and actions are not tolerated. The behaviors of a "man for others" and other inclusive posters should be outlined in classrooms.

Being more approachable — Students are silent about their struggles on campus because it is difficult to confide in a teacher or adult about the bullying or harassment they have experienced. One way to increase their openness to talking with adults is to be more approachable. In order to achieve approachability, adults need to take the issue seriously and invest the time and space to listen to the student before immediately moving into problem-solving mode.

Involve parents, family, and community members — Parents and family members are important members of our school community. If everyone conveys the same message about bias, hate, and discrimination, students will get that message. Everyone needs to be aware of policies, goals, and how to be an ally.

Response — When an incident is reported, an immediate response needs to be given. Students who are facing discrimination or bullying need to be affirmed and supported — an appropriate safe space on campus should be designated.

In our education, there is an imbalance of stories being told. We have gotten stuck hearing one voice, one perspective, one narrative. Most of our classes focus on the European aspects of American culture even though American culture is a rich blend created by the contributions of thousands of different races and ethnicities. In order to establish a more inclusive environment, adjustments must be made in the classroom. Here are some examples of how we can make this change a reality at Jesuit:

In our English classes, we need to have more dialogues with students about racial inequity and discrimination. We need literature to be reflective and inclusive of a variety of experiences, perspectives, and backgrounds, while not being nationality-specific, so that the stories we learn about represent the world we live in. While learning about slavery is important, hearing Black success stories is equally as important — the stories of Black people must not be restricted to

oppression. Too often the stories we hear of Black, Latino, or immigrant peoples, are stories of trauma or almost superhuman perseverance in the face of oppression. We need to give people space to express their full humanity, not just suffering.

The Science Department should invest time in teaching to students how Darwinism has been used to create classifications of Indigenous people around the world. Science classes should also allocate more time to studying underrepresented scientists, especially female scientists and scientists of other ethnicities, who helped make major breakthroughs in the scientific field, but are oftentimes left in the shadows of other big name scientists. Moreover, science invites students to explore creative thinking to find solutions to problems and answer questions about the world we live in. We are asked to solve hydrogen bonds, but what about the importance of human connections? Science explains our innate interrelatedness — how our biological makeup is nearly identical. It is critical that we are given opportunities to use the power of observation to discern the way we relate to the world and how the world shapes us.

The Math Department should place more emphasis on the basis of statistical analysis. Statistics simply result from the execution of the policies of the current social system, and are therefore often engraved with bias. Students need to better understand the sources of statistics and statistical percentages (from linear regression and data collection) so that they stop treating numbers as divine truths. It is illogical to think that all statistical percentages are the answers to each argument and moral situation. In addition, Social Justice can be incorporated into the curriculum by viewing how statistics perpetuate harmful stereotypes that limit the way we perceive the spectrum of races. Also, statistics can reveal injustices within the systems of our world.

In the Social Sciences, focus should expand beyond just European contributions to incorporate the developments made by other countries and cultures. Students need to expand their horizons to have a complete view of the world and its history, not just bits and pieces.

Although grammar and mechanics are essential components of the curriculum of foreign language classes, emphasis on the cultural aspects of these languages are equally as important. More class time should be devoted to educating students on where, when, and through whom these languages evolved.

Theology teachers should help further mitigate gender roles, equal gender rights, homophobia, and racism in their teachings, being open to discussion about these topics and not skimming over them out of fear. Homophobia and racism are two highly controversial topics addressed in the Bible. These topics should be further unraveled and their nuances fully brought to light by the course curriculum through deeper discussions. There are many opportunities for discussion in

our classes, none more than during our Social Justice course. In addition, in their sophomore and junior classes, teachers should try to introduce philosophical texts to help students think critically towards concepts of morality, God, law, and doctrine. They should also learn how to apply reasoning to Theology to help students logically understand the most difficult concepts.

As students, we should continue to strive to be more sensitive to our peers. Our attentiveness to our fellow students will help create a positive and benevolent culture at Jesuit High School, in which students will be more likely to succeed as socially responsible individuals who are better prepared to improve the world around us. A Jesuit student should be, as the Grad-at-Grad profile states: *"Loving: He will begin to know and accept himself as being loved by others and being personally known and loved by God. He will begin to see and understand obstacles to human growth in the world, such as prejudice, while recognizing the ability of people and structures to change."* Also, a Jesuit student should be committed to doing justice: *"He will have a growing understanding of injustice and its sources in the world and begin to see that Christian faith demands an active commitment toward fostering a just society. He will have acquired skills, such as an understanding of government and public policy, and the motivation to use his skills for the benefit of humanity."* Remembering these principles and exemplifying them in our actions is how we act as true men for and with others — the unmistakable bond of brotherhood.

Change is what we need as a community. It's time to confront uncomfortable realities that demand our attention now. As brothers, we need to fully support each other and not shy away from this moment to better ourselves. As a Jesuit institution, it is our shared obligation to stand in solidarity against discrimination. We cannot change what has happened, but we can change what we do now. We ask that you consider what we have written as it would be a firm stance against inequality and a positive step towards inclusion.

Thank you for your consideration.

Sincerely,
Concerned members of the Jesuit Community

George Sicner '21, Matt Parks '21, Tommy Contreras '22, Adam Sherif '22, Alonso Lee '22

Exhibit C

Case 2:21-cv-01347-KJM-KJN   Document 1   Filed 07/29/21   Page 33 of 37



Concerned Parents JHS Sacramento 💬 1

# SUPPORT THE EFFORT of CONCERNED PARENTS JHS SACRAMENTO

Show your support by signing this petition now ⟶

2 people have signed.

|    1%    |

👤 Cayleen Bellicano signed recently

Restore Authentic Catholic Education at Jesuit High School Sacramento-

October 6, 2020

Dear President McGarry, Dr. Wood, Dean Theodule, Jordan Brown, Members of the Jesuit Administration and Board of Trustees:

In fellowship and peace, we hope this letter finds you well. We want to commend you for your prompt response to student concerns regarding racial inequities at Jesuit High School. It was with great sadness that we learned some students have experienced racism at JHS, and we are glad to know racism will not be tolerated. We stand with you in taking steps toward maintaining and improving the positive, faith-filled community at JHS which embraces every student; making them feel valued as sons of God no matter their background.

We are writing today to address concerns regarding a student letter dated June 23, 2020 that was distributed directly to the student body (without parental notification) from the Office of Equity and Inclusion. Furthermore, we are alarmed that JHS has taken subsequent actions surrounding controversial race narratives that deserve parental notification. Many statements and actions also have catechetical errors that have not been addressed. As purveyors of truth, it is important for JHS to offer clarification in the best interest of all young men entrusted to your care. As we share our concerns, know that we represent a broad cross-section of the JHS

community.Some of us are people of color and have children of color in varying ethnic groups. Our concerns are as follows:

Lack of Parental Notification

Parents should have been notified about the letter and had an opportunity to read it prior to distribution to the student body. It was also highly inappropriate for the school to have asked students to sign any document without parental involvement. Per the JHS mission statement, we parents, by the sacrament of baptism, are our children's first teachers. Sharing this letter with parents on such a weighty subject would have provided the opportunity to discuss the issue of racism within the context of our son's personal experiencesat JHS. The secrecy of keeping the letter from parents seems to reflect an already decided upon agenda.

It is important to note that several parents contacted the administration asking the student letter be distributed to all families. Unfortunately, their requests were denied and the tone of the responsewas rather dismissive. This is very disappointing considering the sacrifices made for a Jesuit education. We all invest our time, talent, and treasure as a way to give back to God. We have partnered and trusted you to lead our children to all that is true, beautiful, and honorable. Our confidence is shaken.

Promotion of Controversial Race Narratives

The letter suggests that JHS take steps to teach about racism according to a certain agenda which takes a so-called "anti-racist" approach rather than allowing individual parents to approach the subject according to their conscience. It also suggests the manner in which parents have taught their children about racism is wrong. We find these approaches are in and of themselves racist in nature. We categorically oppose any approach rooted in these so-called anti-racist programs and we refuse to accept there is a need to "re-imagine" the curriculum. It is evident these approaches are rooted in Critical Race Theory. They echo group-think and propaganda-based principles which strive to induce "white guilt," which creates more division among our students.

We are also alarmed about the one-sided narrative that permeates the student letter, the school's curriculum, and recent communication from Jesuit newsletters from the president and principal. It seems faulty narratives pushed by the mainstream media and groups with a Marxist foundation that advocate anti-religion and anti-nuclear family, are now being adopted by students, faculty and staff. We are against police brutality and the

taking of innocent life, and we support the swift application of justice. However, we also believe in a thorough investigation prior to drawing an absolute conclusion. Many in private and public lifecontinue to spread false

JHS Parental Concerns – Page 2

information about circumstances surrounding various cases, and instead encourage riots and looting. In the spirit of Jesuit spirituality, are we not to seek that our boys be informed of the full truth rather than be subjected to biased or false narratives?

Subjugation of Free Speech and Critical Thinking

As parents, we are dismayed to learn that some of the teachers at JHS have been blatantly biased against students who have expressed a particular political leaning.

Teachers are reported to engage in discussions and assign work that reveals their personal biases. They also have been reported to express disdain toward students who don't share their views. This is also a form of discrimination. Especially in a private, faith-based academic setting where students should feel safe defending their values. This includes forcing students to adopt controversial critical race theory principles and collective guilt based on white privilege.

These approaches contribute to segregation and encourageresentment of other races as they are one-sided and not reflective of a Christian environment where all of Gods' children are intrinsically valued. Through this very letter, we are acknowledging the detrimental effects of such principles through recent conversations and new student organizations such as "Companions For Justice." The description of the club reads: "Companions for Justice is a club that helps students better understand their privilege especially but not solely derived from the social construct of Whiteness and that works to leverage that privilege in support of other systemically disenfranchised groups. It is explicitly anti-racist while also addressing other systemic inequities at school and in the greater world."

We should be united as a nation and grow even closer to living the unifying words of Martin Luther King Jr., and in Jesus Christ himself to "Love one another as I have loved you" (John 13:34). Yet, we have seen the unfortunate racial divide widen in just the last five years because of these theories. These narratives, perpetuated by social media, have had several damaging effects. Our children have reported sadness, confusion, bewilderment, and are feeling pressured to admit guilt and shame because of the color of their skin. This could be considered a form of psychological and emotional abuse. We are also being told as parents that we are unaware of our own racism despite our assertion that nothing could be further from the truth. Thisagenda is doing a monumental disservice to our boys' psyche, negatively impacting their interactions with one another.

Lack of Reference to the Bible and Catechism

We would like to suggest that Jesuit assert what is already in the Bible and the Catechism of the Catholic Church: we are all children of God who are created in His image and likeness. AddressingCatholic social teachings on race relations using a Gospel-based approach rather than adopting secular resources should be automatic at a Catholic high school. We strongly believe this is an opportunity for Jesuit to strengthen their mission of "Men for Others" by uplifting every individual in the student body rather than polarizing them based on skin color under the disguise of social justice. For example, highlighting accomplishments of under-represented groups is a good idea but only within the larger goal of preparing students for careers beyond high school. Making changes that do not align with college entry requirements for top national universities is counter-productive and unnecessary.

While there is always room to grow and evolve as an institution, one must be prudent about suggestions to "re-imagine" foundational teachings rooted in the Magisterial Teachings of the Catholic Church." For JHS to accept the suggestions as outlined in the student letter would provoke a scandalous crisis, proving the administration itself has neglected to identify various canonical errors as noted here:

JHS Parental Concerns – Page 3

Theology - Darwinism was suggested as an area that should be adopted and taught. Per our understanding, Darwinism denies God's divine role in the creation of human beings. This is a very

problematic suggestion which denies God's creation of the first two humans, and as a result there would be no Fall. If there is no Fall, no original sin would exist, and if there is no original sin, there would be no need for our Redeemer, Jesus Christ. If there is no need for redemption, there is no need for the sacraments, for the Faith, nor the Church. Deuteronomy10:14: All of heaven and earth belong to the Lord. Psalm 24:1-2: All the earth is the Lord's. Daniel 3:56-82: Creation proclaims the glory of God. Matthew 6:25-34: God loves and cares for all of creation. Romans 1:20: Creation reveals the nature of God.

Science - Scientific and biological facts will remain true no matter what society asserts. Men and women are created differently by God and have assumed gender specific roles for millennia. We want to see Jesuit remain steeped in teaching objective Truth in relation to God's design of men and women and how it is based on Natural Law. He, in His infinite wisdom, designed and created men to be complementary to women. The Bible and Catholic Church teaching on this is very clear in the Old and New Testaments, but there is nothing written on homophobia. The same sentiments are echoed and upheld in the Catechism to always have compassion and view those who have an attraction to the same sex as children of God. Ministering to students who may experience same sex attraction is important, but it should also be done within the framework of the Gospel.

Math & Statistics – These fields have always been constant. Man can in fact manipulate research and insert bias. However, students should be taught the moral consequences of inserting bias in research.The role of JHS is to assert what the Catechism states: "Although scientific research is an aspect of man's domination over creation, technology must be placed at the service of man. Scientific research finds both its purpose and its limits in the person and in his moral values." CCC: 22292-2293

Summary and Suggestions:

We sincerely support JHS's efforts to create an equitable, peaceful, and loving environment for all of our boys. We seek to partner with you by committing to having thoughtful discussions with our children about race, and support your efforts in addressing policies that would amend any past hurts. We respectfully request that you address ourconcerns by taking the following actions:

1. Distribute the letter from June 23, 2020, immediately, to all parents

2. Offer full transparency with race relation training or instruction done according to Gospel teachings

3. Ban critical race theories or any instruction or clubs that include or promote "white privilege"

4. Put the word "Christian" back in "Christian Service," which was changed to "Service and Justice"

5. Provide an opportunity to gather in person to discuss and plan on how to move forward.

If JHS persists on the path of adopting the "re-imagining" of its curriculum, imposes these so-called ant-racist instructions, fostersorganizations that include "whiteness," or advocates concepts of "white privilege," we are certain Jesuit will see a mass exodus. We hope our letter will encourage the administration and faculty of

JHS to examine and preserve its Catholic identity so that current students, parents, alumni, donors, and future parents can continue to entrust you with the education of our boys and help them grow to be Men for Others.

Sincerely,

Concerned Parents

Contact: JHSconcernedparents@gmail.com

Concerned Parents

Contact: JHSconcernedparents@gmail.com

---

Share for Success

1    **COMMENT**

Gayleen Pellicano
Oct 19, 2020

upvote    reply    show
Oct 19, 2020

Amazing letter 

Sign in to comment

---

2    **SIGNATURES**

9 months ago
Gayleen Pellicano United States
9 months ago