1   MARCIE ISOM FITZSIMMONS (SBN: 226906)
    misom@grsm.com
2   DANNY A. BARAK (SBN: 252066)
    dbarak@grsm.com
3   GORDON REES SCULLY MANSUKHANI, LLP
    275 Battery Street, Suite 2000
4   San Francisco, CA 94111
    Telephone: (415) 986-5900
5   Facsimile: (415) 986-8054

6   Attorneys for Defendants
    JESUIT HIGH SCHOOL OF SACRAMENTO,
7   JOHN P. MCGARRY, S.J., and MICHAEL WOOD, Ed.D.

8

9                        UNITED STATES DISTRICT COURT

10                       EASTERN DISTRICT OF CALIFORNIA

11  A.P., by and through his father,          )   CASE NO. 2:21-cv-01347-KJM-KJN
    VINCENZO P., and VINCENZO P.,             )
12  individually                              )
                                              )   **DEFENDANTS NOTICE OF**
13                          Plaintiffs,        )   **MOTION AND MOTION TO**
                                              )   **DISMISS PURSUANT TO FEDERAL**
14          vs.                               )   **RULE 12(b)(6)**
                                              )
15  JESUIT HIGH SCHOOL OF                     )   Date:        October 8, 2021
    SACRAMENTO, a California corporation,     )   Time:        10:00 a.m.
16  JOHN P. MCGARRY, S.J., an individual, and )   Courtroom:   3, 15th floor
    MICHAEL WOOD, Ed.D., an individual,       )
17                                            )   Action Filed: July 29, 2021
                            Defendants.        )
18  _____ )

19          TO ALL PARTIES AND COUNSEL OF RECORD:

20          PLEASE TAKE NOTICE that on October 8, 2021, at 10:00 a.m., or as soon thereafter

21  as the matter may be heard in Courtroom 3 of the above-entitled court, located at 501 I Street,

22  Sacramento, CA  95814, Defendants JESUIT HIGH SCHOOL OF SACRAMENTO, JOHN P.

23  MCGARRY, S.J., and MICHAEL WOOD, Ed.D. ("Defendants") will and hereby moved

24  pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' Complaint.

25          Per this Court's Standing Order, Item #4, the undersigned hereby certifies that meet

26  and confer efforts have been exhausted.  Defendants refer the Court to the Declaration of

27  Marcie Fitzsimmons, submitted concurrently with the instant notice of motion and motion, for

28  the required brief summary of the parties' meet and confer efforts. (Fitzsimmons Decl., ¶4, Ex.

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1  3.)

2       These motions are supported by the Memorandum in support of Defendants' Motion to

3  Dismiss, Declaration of Marcie Isom Fitzsimmons, Defendants' Request for Judicial Notice,

4  and the pleadings on file.

5

6  Dated: September 3, 2021          GORDON REES SCULLY MANSUKHANI, LLP

7

8  By:    */s/*  Maricie Isom Fitzimmons
                  Marcie Isom Fitzsimmons

9                    Danny A. Barak
                  Attorneys for Defendants

10                    JESUIT HIGH SCHOOL OF
                  SACRAMENTO, JOHN P. MCGARRY,

11                    S.J., and MICHAEL WOOD, Ed.D.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Gordon Rees Scully Mansukhani, LLP*
*275 Battery Street, Suite 2000*
*San Francisco, CA 94111*

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
FEDERAL RULE 12(b)(6)          Case No. 2:21-cv-01347-KJM-KJN

# TABLE OF CONTENTS

MEMORANDUM ...................................................................................................6

I.      INTRODUCTION.........................................................................................6

II.     FACTUAL AND PROCEDURAL HISTORY ...........................................6

III.    LEGAL STANDARD FOR 12(b)(6) MOTIONS to dismiss ......................9

IV.     ARGUMENT .................................................................................................10

        A.      Plaintiffs' Entire Complaint Should Be Dismissed Based on the
                Ecclesiastical Abstention Doctrine ....................................................10

                1.      The Doctrine Prevents Courts From Questioning Faith-Based
                        Decisions of Religious Institutions.............................................10

                2.      The Doctrine Prohibits Plaintiffs from Asserting Each Cause of
                        Action .........................................................................................12

        B.      Even if the Doctrine Did Not Apply, A.P.'s Title VI and Rehabilitation
                Act Claims Should Be Dismissed Because Defendants are Not Subject
                to Liability Based on Receipt of a PPP Loan in This Instance .............15

        C.      Even if Defendants Could Be Subject to the Federal Statutes Based on
                Receipt of a PPP Loan, A.P.'s ADA Claim Fails Because Jesuit is
                Exempt from Title III...........................................................................18

        D.      Plaintiffs Fail to State a Cause of Action Under Any of Their Three
                Contract-Based Claims.........................................................................19

        E.      Plaintiffs Fails to Allege Standing to State a Claim Under the UCL ..22

        F.      Plaintiffs Fail to Demonstrate Extreme and Outrageous Conduct
                Sufficient to State a Claim for IIED.....................................................22

V.      CONCLUSION ..............................................................................................25

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
FEDERAL RULE 12(b)(6)                              Case No. 2:21-cv-01347-KJM-KJN

# TABLE OF AUTHORITIES

## California Authorities

*Alcorn v. Anbro Eng'g, Inc.*
(1970) 2 Cal.3d 493 ..................................................................................23
*Careau & Co. v. Security Pacific Business Credit, Inc.*
(1990) 222 Cal.App.3d 1371 .....................................................................19
*Christensen v. Superior Court*
(1991) 54 Cal.3d 868 ................................................................................22
*Guz v. Bechtel Nat'l, Inc.*
(2007) 24 Cal.4th 317 ...............................................................................19
*Hughes v. Pair*
(2009) 46 Cal.4th 1035 .............................................................................23
*Kashmiri v. Regents of Univ. of California*
(2007) 156 Cal.App. 4th 809 ....................................................................20
*Kwikset Corp. v. Superior Ct.*
(2011) 51 Cal.4th 310 ...............................................................................22
*Oasis W. Realty, LLC v. Goldman*
(2011) 51 Cal.4th 811 ...............................................................................19
*Tollefson v. Roman Catholic Bishop*
(1990) 219 Cal.App.3d 843 ......................................................................23
*Trerice v. Blue Cross of Calif.*
(1989) 209 Cal.App.3d 878 ......................................................................24

## Federal Authorities

*1 Energy Sols., Inc. v. Nicholas Holiday, Inc.,*
2013 WL 12113654, at *2 (C.D. Cal. Nov. 5, 2013).................................19
*Bethany Powers Sloan v. Community Christian Day School,* LLC,
2015 WL 10437824, at *1-2 (M.D.Tenn. Dec. 11, 2015) .........................18
*Buscemi v. McDonnell Douglas Corp.,*
736 F2d 1348, 1352 (9th Cir. 1984) .........................................................24
*C.H. v. Brentwood Union Sch. Dist.,*
2021 WL 3271169, at *5 (N.D. Cal. July 30, 2021).................................23
*Cannata v. Philip Morris USA, Inc.,*
2003 WL 23340890, *2 (CD. Cal. 2003)..................................................10
*Conservation Force v. Salazar,*
646 F.3d 1240, 1242 (9th Cir. 2011) ........................................................10
*Corales v. Bennett,*
488 F.Supp.2d 975, 988 (C.D.Cal. May 21, 2007)...................................24
*Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.,*
565 U.S. 171 (2012).................................................................................14
*Johnson v. Chapman University,*
2021 WL 3463897, at *3 (C.D.Cal. Apr. 1, 2021) ...................................23
*Knievel v. ESPN,*
393 F.3d 1068, 1076 (9th Cir. 2005) ........................................................10
*Landucci v. State Farm Ins. Co.,*
65 F.Supp.3d 694, 716 (N.D. Cal. 2014)..................................................19
*Layman v. Alloway Stamping & Mach. Co.,*
98 F. App'x 369, 374 (6th Cir. 2004) .......................................................18
*Lemon v. Kurtzman,*
403 U.S. 602, 616 (1971)..........................................................................14
*Morning Star Packing Co. v. S.K. Foods, L.P.,*
No. 2:09-CV-00208-KJM, 2015 WL 3797774, at *2 (E.D. Cal. June 18, 2015)...................16
*Norfleet v. Gaetz,*
820 F. App'x 464, 469 (7th Cir. 2020) ......................................................18

**Gordon Rees Scully Mansukhani, LLP**
275 Battery Street, Suite 2000
San Francisco, CA 94111

*Northstar Financial Advisors Inc. v. Schwab Investments*,
   779 F.3d 1036, 1050–51 (9th Cir. 2015) ................................................................19
*Paul v. Watchtower Bible & Tract Soc. of New York, Inc.*,
   819 F.2d 875, 878 at fn. 1 (9th Cir. 1987) ..............................................................11
*Rankin v. Global Tel*Link Corp.*,
   2013 WL 3456949, at *14 (N.D. Cal. Jul. 9, 2013) .................................................20
*Rashdan v. Geissberger*,
   2011 WL 197957, at *10-11 (N.D.Cal Jan. 2014) ..................................................24
*Regents of Univ. of California v. Bakke*,
   438 U.S. 265, 284 (1978) .........................................................................................15
*Reynolds v. Allstate Life Ins. Co.*,
   2005 U.S. Dist. LEXIS 36356, *7 (E. D. Cal. 2005) ...............................................10
*Sapiro v. Encompass Ins.*,
   2004 U.S. Dist. LEXIS 22054, *5 (N. D. Cal. 2004) .................................................9
*Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*,
   426 U.S. 696, 713 (1976) .........................................................................................13
*Sky v. Haddonfield Friends School*,
   2016 WL 1260061, at *7 (D.N.J. Mar. 31, 2016) ...................................................18
*Tyshkevich v. Wells Fargo Bank, N.A.*,
   2016 WL 193666, at *4 (E.D. Cal. Jan. 15, 2016) ..................................................10
*U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*,
   477 U.S. 597, 605 (1986) .........................................................................................16
*W. Mining Council v. Watt*,
   643 F. 2d 618, 624 (9th Cir. 1981) ..........................................................................10
*Watson v. Jones*,
   80 U.S. 679, 728-729 (1871) ....................................................................................11
*White v. Denver Seminary*,
   157 F.Supp.2d 1171, 1173 (D.Colo.2001) ...............................................................18

**Non-California State Authorities**

*Askew v. Trustees of Gen. Assembly of Church of Lord Jesus Christ of Apostolic Faith, Inc.*,
   644 F. Supp. 2d 584, 595 at fn. 8 (E.D. Pa. 2009) ..................................................12
*Dlaikan v. Roodbeen*,
   206 Mich. App. 591 (1994) ......................................................................................12
*Gaston v. Diocese of Allentown*,
   712 A.2d 757, 757-758 (Pa. Super. Ct. 1998) ...................................................12, 14
*In re St. Thomas High School*,
   495 S.W.3d 500 (Tex. App. 2016) ...........................................................................11
*In re Vida*,
   2015 WL 82717, at *3 (Tex. App. Jan. 7, 2015) ....................................................12
*Winkler by Winkler v. Marist Fathers of Detroit, Inc.*,
   500 Mich. 327 (2017) ...............................................................................................12

**California Statutes and Rules**

Cal. Bus. & Prof. Code §17200 ..................................................................................22

**Federal Statutes and Rules**

29 U.S.C. §794 ...........................................................................................................15
42 U.S.C. §12182 .......................................................................................................18
42 U.S.C. §12187 .......................................................................................................18
42 U.S.C. §2000d .......................................................................................................15
Fed. R Civ. P, Rule 12(b)(6) ...................................................................................9, 25

**Federal Regulations**

13 C.F.R. §113.3 ........................................................................................................16
13 C.F.R. §113.3-1 ...............................................................................................16, 17
28 C.F.R. §Pt. 36, App. C ..........................................................................................18

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

## MEMORANDUM

## I.     INTRODUCTION

This action is brought by a former Catholic high school student (hereinafter "A.P." or Plaintiff) and his non-minor father (hereinafter "Vincenzo P.", collectively "Plaintiffs") against his former school, Jesuit High School of Sacramento (hereinafter "Jesuit"), its president, John P. McGarry, S.J., and its principal, Michael Wood, Ed.D. (hereinafter "Mr. Wood", collectively "Defendants").  Stripped of all its irrelevant allegations regarding Critical Race Theory, allegations that clearly seek to take advantage of a current issue of national debate without any relationship to the actual facts alleged, the dispute is fairly simple to understand.  Jesuit had standards for behavior and an unfettered right, per its "Christian philosophy" to exact whatever discipline it felt appropriate when a student violated those standards.  A.P. admitted using racist, homophobic, and disability-related slurs, was provided an opportunity to defend his actions, and the Discipline Board decided to terminate his enrollment, and allow him to withdraw.  As Defendants will demonstrate in the following argument, not only should all of these claims be dismissed because, per the Ecclesiastical Abstention Doctrine (hereinafter "the Doctrine"), adjudicating such claims would, under these facts, impermissibly require the Court to make determinations of fact inextricably tied to questions of faith and religious doctrine, as well as determinations regarding the credibility of Defendants' good faith belief that Jesuit's Christian Mission and philosophy necessitated their ultimate decision to separate from A.P.  Moreover, even without reference to the Doctrine, none of A.P.'s federal discrimination claims can apply to the conduct alleged, and Plaintiffs' state law claims are all insufficiently pleaded or contradicted by the terms of the Student-Parent Handbook, upon which Plaintiffs rely for many of their claims.  As such, Defendants respectfully request that the instant motion to dismiss be granted, without leave to amend.

## II.     FACTUAL AND PROCEDURAL HISTORY

### Jesuit's Policies: The Student/Parent Handbook

Jesuit High School is a Catholic High School in the greater Sacramento area.  (See Compl., ¶10.)  Jesuit provides to all students and their parents a handbook (the "Handbook")

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

that contains all of Jesuit's policies, including its behavioral and disciplinary policies, and requires parents and students to agree to abide by those policies.  (*Id*. at ¶16)  Jesuit informs all students and parents:

> As a necessary condition of continued enrollment, students must behave in a manner, both on and off campus, that is consistent with the principles and philosophy of Jesuit High School. These principles include, but are not limited to, any policies, principles or procedures set forth in our Student-Parent Handbook. It is also a condition of enrollment that the parent/guardian of each student conform to these standards of conduct as determined by Jesuit High School.

(See RJN and Decl. of Marcie Fitzsimmons, ¶2, Ex. 1, p. 3.) [1] [2] The Handbook also states that Jesuit "**reserves the right to determine, at its discretion, which actions fail to meet the principles and Christian philosophy of the school**. Failure to follow these guidelines may result in a warning, disciplinary action short of dismissal, a suspension of a student and/or parent /guardian's privilege to attend or to participate in school activities, or dismissal depending on the severity of the offense."  (*Ibid*., emph., added)

The Handbook goes on to list the behavior and disciplinary practices and procedures involved.  In relevant part, the Handbook includes:

(1) a zero-tolerance policy towards harassment, the nature of which may pertain to, but is not limited to, "an individual's race, creed, color, national origin, culture, gender, appearance, mannerisms, sexual orientation, physical or mental disability", the violation of which could lead to a student's dismissal (See *id*. at p. 4);

(2) a description of the Handbook as a "contract" in which parents and students agree, "as a condition of enrollment at Jesuit High School" to "comply with all school regulations." (*id*. at p. 5);

(3) acknowledgment of the voluntary and privileged nature of the association between the school and the student, noting that "the relationship can be

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

---

[1] Citation to the pages in the handbook refer to those numbers highlighted in yellow at the bottom of each page.
[2] As noted in their Request for Judicial Notice, Ex. 1 to the Fitzsimmons declaration is the full and complete copy of the Handbook both referenced at length in the complaint, and contains specific language not found in the abridged Handbook attached to the Complaint as Ex. A.  Based on the incorporation by reference doctrine, *infra*, judicial notice of this document is appropriate in this motion to dismiss.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO FEDERAL RULE 12(b)(6)                    Case No. 2:21-cv-01347-KJM-KJN

**Gordon Rees Scully Mansukhani, LLP**
275 Battery Street, Suite 2000
San Francisco, CA 94111

1    terminated at any time and for any reason, either by the parents/legal guardian of

2    the student or by the school administration." (*ibid*.);

3    (4) a zero-tolerance policy for bullying/insensitive speech/hazing, with insensitive

4    speech defined as "written words, spoken words, images or gesturing that is

5    offensive to one or more persons," and dismissal as a potential punishment for

6    such bullying and insensitive speech (*id*. at p. 32);

7    (5) reservation of the right to note "Withdrawn- Discipline" on a student's

8    transcript if the student withdraws pending disciplinary action, and to disclose a

9    student's disciplinary history to the transfer school, CIF, and/or district office (*id*.

10   at p. 55); and

11   (6) a further list of behavior sufficient for dismissal that includes "language or

12   behavior, both implied and explicit, which are deemed immoral, lewd,

13   scandalous, profane, vulgar or obscene" and "any other actions deemed serious, at

14   the discretion of the Principal or designee."  (*Id*. at p. 61.)

15   While the Handbook provides Jesuit the absolute discretion to dismiss a student without any

16   form of a disciplinary hearing (see *id*. at p. 62, Section 2.00), the administration may, at its

17   discretion, provide the student with an informal hearing, and the policies explicitly provide for

18   how those proceedings will be conducted.  (*Id*. at 62-65.)

19   **The Complaint: A.P.'s Conduct**

20   Per the complaint, at the time of the alleged incident, A.P. was a junior at Jesuit.

21   (Compl., ¶38.)  A.P. alleges that he is a Mexican-American student and has certain learning

22   disabilities, including ADHD and dyslexia.  (*Id*. at ¶7.)  Plaintiff Vincenzo P. is A.P.'s father.

23   (*Id*. at ¶8.)  In his complaint, A.P. admits that he used the word "retarded" in a class

24   discussion. (*Id*. at ¶23.)  Following an on-campus event on April 23, 2021, at a swim meet

25   taking place on campus, A.P. was overheard using the "N-word" in front of several other

26   students, and calling another student a "fag."  (Compl., ¶38.)  The incident was reported to the

27   Dean's office by another student. (Compl., ¶38.) When confronted by the Dean about the

28   allegations, A.P. admitted to using the word "fag," but alleges that he stated that he never used

-8-

the N-word in manner directed at or in reference to a person.  (*Id*. at ¶41.)

On May 5, 2021, Jesuit told A.P. not to attend classes until a "formal hearing" was held.  (*Id*. at ¶43.)   On May 12, 2021, Jesuit's Discipline Board held a hearing via Zoom, A.P. alleges he was required to answer questions from the Board members.  A.P. alleges that the Discipline Board ultimately determined that he needed to withdraw from Jesuit, with discipline noted as the reason for withdrawal on his transcript.  (See *id*. at ¶¶44-49.)  A.P. alleges that the following day, Defendant Wood, the school principal, notified A.P. and his mother of the Board's decision, which he explained was based on the fact that A.P. had used racist and homophobic slurs, and referenced other previously documented misconduct, intervention for which had failed to result in changed behavior.  (*Id*. at ¶49.)

A.P. and his father filed their lawsuit on July 29, 2021.  Plaintiffs allege eight causes of action against Jesuit, Jesuit's President (Dr. McGarry), and Mr. Wood.  On his own behalf, A.P. alleges claims for race/national origin discrimination under Title VI of the 1964 Civil Rights Act ("Title VI"), disability discrimination and failure to accommodate under both Section 504 of the 1973 Rehabilitation Act (the "Rehab Act"), and Title III of the Americans with Disabilities Act (the "ADA"), as well as a claim for intentional infliction of emotional distress ("IIED").  Those four claims are asserted against all Defendants.  Additionally, A.P. and his father assert claims against Jesuit alone for breach of express contract, breach of implied in fact contract, breach of the covenant of good faith and fair dealing, and violations of the Unfair Competition Law (the "UCL", Cal. Bus. & Prof. Code §17200.) [3]

### III.   LEGAL STANDARD FOR 12(b)(6) MOTIONS TO DISMISS

Fed. R Civ. P, Rule 12(b)(6) tests the legal sufficiency of claims asserted in a complaint. (*Sapiro v. Encompass Ins.*, 2004 U.S. Dist. LEXIS 22054, *5 (N. D. Cal. 2004) (citation omitted).)  "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." (*Conservation Force v.*

[3] Prior to the submission of this motion, Defendants submitted an ex parte application for an extension of time to file a responsive pleading per Local Rule 144(c) and this Court's standing orders.  Having not received a disposition on that application before having to file the instant motion, Defendants' file this motion in an abundance of caution.

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1   *Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011), internal quotation marks and citation omitted.)

2   While a plaintiff's factual allegations are to be accepted as true at this stage of the litigation, in

3   ruling on a motion to dismiss, the court need not accept as true unreasonable inferences or

4   conclusory legal allegations cast in the form of factual allegations. (*W. Mining Council v.*

5   *Watt*, 643 F. 2d 618, 624 (9th Cir. 1981); *Reynolds v. Allstate Life Ins. Co.*, 2005 U.S. Dist.

6   LEXIS 36356, *7 (E. D. Cal. 2005) ["Conclusory allegations of law and unwarranted

7   inferences are insufficient to defeat a motion to dismiss for failure to state a claim."].)

8   Moreover, allegations in the Complaint that are contradicted by facts established by reference

9   to documents attached as exhibits need not be accepted as true allegations. (*Cannata v. Philip*

10  *Morris USA, Inc.*, 2003 WL 23340890, *2 n. 1 (CD. Cal. 2003) ["The Court may disregard

11  allegations in the complaint if they are contradicted by facts established by reference to any

12  documents attached as exhibits, or upon which it necessarily relies ..."] (citations omitted).)

13  "Even where a document is not subject to judicial notice, however, the court may still consider

14  a document proffered for judicial notice, if it qualifies under the "incorporation by reference"

15  doctrine." (*Tyshkevich v. Wells Fargo Bank, N.A.*, 2016 WL 193666, at *4 (E.D. Cal. Jan. 15,

16  2016).) This doctrine extends "to situations in which the plaintiff's claim depends on the

17  contents of a document, the defendant attaches the document to its motion to dismiss, and the

18  parties do not dispute the authenticity of the document, even though the plaintiff does not

19  explicitly allege the contents of that document in the complaint." (*Knievel v. ESPN*, 393 F.3d

20  1068, 1076 (9th Cir. 2005).)

21              **IV.    ARGUMENT**

A.   **Plaintiffs' Entire Complaint Should Be Dismissed Based on the Ecclesiastical**
22       **Abstention Doctrine**

23           **1.    The Doctrine Prevents Courts From Questioning Faith-Based Decisions of**
24                **Religious Institutions**

25       The "Ecclesiastical Abstention Doctrine" ("the Doctrine") provides that "civil courts

26  may not redetermine the correctness of an interpretation of canonical text or some decision

27  relating to government of the religious polity. Rather, we must accept as a given whatever the

28  entity decides." (*Paul v. Watchtower Bible & Tract Soc. of New York, Inc.*, 819 F.2d 875, 878

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

at fn. 1 (9th Cir. 1987).)  In addition to being applied in employment and property disputes, the Doctrine, or some form of it, has been applied to matters involving students of faith-based schools.  The jurisprudential foundation for the doctrine can be traced as far back as 1871, where the U.S. Supreme Court held that:

> it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

(*Watson v. Jones*, 80 U.S. 679, 728-729 (1871).)  Following that seminal decision, courts, both federal and state alike, have generally sought to afford religious tribunals the deference mandated under *Watson* and its progeny when adjudication would necessarily require those courts to make factual determinations regarding religious doctrine and the sincerely held religious beliefs of the members of such ecclesiastical tribunals.

By way of example, in *In re St. Thomas High School*, 495 S.W.3d 500 (Tex. App. 2016), a dispute arose over a student's final grades from a faith-based school.  The student's parents wrote a letter to the school's principal and dean of students, in which they denigrated the quality of education their son received, and falsely accused the teacher of using inappropriate and sexually harassing language.  (*Id*. at 503-504.)  Although the student was never accused of doing anything wrong, the school had a policy in which sufficiently abusive conduct by a parent could lead to that student's expulsion, which is precisely what happened in that case.  (*Id*. at 504.)  The parents sought injunctive relief and the trial court granted it, ordering that the student be allowed back to school during the pendency of the case.  (*Id*. at 505.)  The appellate court reversed the trial court and dismissed the case for lack of subject matter jurisdiction based on the Doctrine.  The appellate court found that "exclusive focus on the presence or absence of an express dispute concerning religious doctrine demonstrates an unduly narrow conception of the applicable protections."  (*Ibid*.)  The court held that not only did the record include reference to both academic and spiritual standards set forth in the student handbook, but that the action itself, seeking injunctive relief, "demonstrates

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO FEDERAL RULE 12(b)(6)                                           Case No. 2:21-cv-01347-KJM-KJN

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

impermissible interference with St. Thomas's management of its internal affairs and encroachment upon its internal governance." (*Id*. at 514.)

By way of another example, in *Gaston v. Diocese of Allentown*, 712 A.2d 757, 757-758 (Pa. Super. Ct. 1998), a faith-based school expelled a brother and sister for disciplinary issues. The court invoked the Doctrine, holding:

> The parochial school, synonymous with the installation of dogma and discipline in its students, is an integral part of the Roman Catholic Church. The school is a repository for Catholic tradition and scripture; it is so intertwined with the church doctrine that separation is neither pragmatic nor possible. Intrusion into the bishop's decision on matters concerning parochial school discipline and expulsion places this court perilously close to trespassing on sacred ground.

(*Id*. at 761.) Other state courts have likewise abstained in these school admission/expulsion/ discipline cases. (See, e.g. *Dlaikan v. Roodbeen*, 206 Mich. App. 591 (1994), overruled on other grounds by *Winkler by Winkler v. Marist Fathers of Detroit, Inc.*, 500 Mich. 327 (2017) [holding that school's decision not to readmit three students was not merely an issue of contract: "When the claim involves the provision of the very services (or as here refusal to provide these services) for which the organization enjoys First Amendment protection, then any claimed contract for such services likely involves its ecclesiastical policies, outside the purview of civil law."]; see also *In re Vida*, 2015 WL 82717, at *3 (Tex. App. Jan. 7, 2015) [holding that admission policies for schools subject to the authority of the Church under Canon law require application of the doctrine]; *Askew v. Trustees of Gen. Assembly of Church of Lord Jesus Christ of Apostolic Faith, Inc.*, 644 F. Supp. 2d 584, 595 at fn. 8 (E.D. Pa. 2009) ["In the parochial school context, unlike most other intrachurch property dispute cases, we know from the outset that such doctrinal questions are necessarily at the core of a school's decision to expel."].) It is with these representative cases in mind that we look to the instant dispute.

**2.     The Doctrine Prohibits Plaintiffs from Asserting Each Cause of Action**

Looking only to the allegations in the complaint, in order for A.P. and his father to succeed on any of the claims asserted in the complaint, the fact-finder would, at a fundamental level, need to find that the Board's basis for its decision to expel A.P. was either untrue (for the discrimination claims and the IIED and UCL claim) or unfounded (for the contract-based

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-12-

claims).  In order to get to that determination, however, the fact-finder would first need to

determine that: (1) use of racial and homophobic slurs do not warrant removal as part of

Jesuit's Christian mission, and (2) the Board members did not sincerely believe that use of

such slurs gave rise to such discipline as part of Jesuit's Christian mission.   Each of the

discrimination claims rely, in part, on determining the "real reason" for the Board's dismissal.

The Board stated it was because he used racist and homophobic slurs. (See Compl., ¶49.)

A.P.'s federal claims contend it was "really" because of his race/national origin or disability.

(*Id*. at ¶66, ¶73, ¶78.) [4] Plaintiffs' contract claims require, on a fundamental level, a

determination that Jesuit did not have a contractual right to discipline A.P. in the manner it did

based on his conduct. (See *id*. at ¶97 [good faith and fair dealing].) Their UCL claim requires

the fact-finder to determine whether the Board's decision to ask A.P. to withdraw, thereby

foregoing an opportunity to receive his tuition the following year, actually constituted a

business practice, and not a decision based on anything but business. (*Id*. at ¶100.)  And

finally, A.P.'s IIED claim requires an examination of Dr. Wood's and Jesuit's actual intent.

Again, to reach the findings Plaintiffs require for success on these claims, the fact-finder must

investigate: (1) whether there "really was" a basis for the discipline he received, and (2) if that

basis was the "real reason" for the decision. (See Compl., ¶106.)

The ultimate result of those two questions is unimportant.  The Doctrine precludes

courts from even *entertaining* those questions, because the first question requires a court to

make ultimate decisions about fundamental doctrinal questions (i.e. "is this basis actually

grounded in doctrine and faith?"), and the second requires a court to make fundamental

decisions about an adherent's sincere good faith belief in such guiding ecclesiastical principles

(i.e. "does this person really believe his or her conduct is required based on his faith?")

---

[4] While his Title VI claim is really grounded on a disparate treatment theory (i.e., he was subjected to discipline and abusive treatment to which Black students are not subjected" (Compl., ¶66), the Doctrine still comes into play because, despite the relative paucity of information provided in the complaint, it requires the fact-finder to determine whether Jesuit applied its policies in a consistent manner.  However, the Supreme Court rejected this approach: "For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense "arbitrary" must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else in to the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits."  (*Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 713 (1976).)

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
FEDERAL RULE 12(b)(6)                                    Case No. 2:21-cv-01347-KJM-KJN

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

"[P]arochial schools involve substantial religious activity and purpose." (*Lemon v. Kurtzman*, 403 U.S. 602, 616 (1971).)  "The Catholic school's disciplinary code and review of expulsion involve matters of church doctrine." (*Gaston*, *supra*, 712 A.2d at 760.)  As such, the "mere adjudication" of exploring the basis of a disciplinary action "would pose grave problems for religious autonomy" and therefore the Doctrine precludes from courts doing so.  *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171 (2012) (Alito, J., concurring). [5]

This, however, is precisely what this Court must do in order to adjudicate on any of the Plaintiffs' causes of action.  Jesuit's parent-student handbook explicitly states that:

> As a necessary condition of continued enrollment, students must behave in a manner, both on and off campus, that is consistent with the principles and philosophy of Jesuit High School. These principles include, but are not limited to, any policies, principles or procedures set forth in our Student-Parent Handbook. It is also a condition of enrollment that the parent/guardian of each student conform to these standards of conduct as determined by Jesuit High School.
> …
> **Jesuit High School reserves the right to determine, at its discretion, which actions fail to meet the principles and Christian philosophy of the school.** Failure to follow these guidelines may result in a warning, disciplinary action short of dismissal, a suspension of a student and/or parent /guardian's privilege to attend or to participate in school activities, or dismissal depending on the severity of the offense.

(See RJN and Fitzsimons Decl., ¶2, Ex. 1, p. 3, emph. added.)    A student's behavior is intended to be "consistent with the principles and philosophy" of the school, and those principles and philosophy at Jesuit are defined, in part, by "any policies, principles, or procedures" in the Handbook. (*Id*.) Such policies and principles include (1) a prohibition on harassment related to, among other things, another's race or sexual orientation (*id*. at p. 4, ¶2), (2) A zero-tolerance policy for insensitive speech, defined as "written words, spoken words, images or gesturing that is offensive to one or more persons," (*id*. at p. 32), and (3) language or behavior, both implied and explicit, which are deemed immoral, lewd, scandalous, profane,

---

[5] According to Justice Alito, such inquiries regarding "pretext" and the "real reasons" behind church decisions "would require calling witnesses to testify about the importance and priority of the religious doctrine in question, with a civil factfinder sitting in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission."  (*Id*. at 205–206 (Alito, J., concurring).)

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO FEDERAL RULE 12(b)(6)                    Case No. 2:21-cv-01347-KJM-KJN

1   vulgar or obscene. (*Id.* at p. 61.)

2        In short, these behavioral policies and principles are based on the Christian philosophy

3   of the school, and the Board's rationale for its decision must be presumed, under the Doctrine,

4   to be consistent with those principles.  Because every cause of action in the complaint, to be

5   successful, must fundamentally question the nature of the Board's decision, the Doctrine

6   precludes such questioning.  As such, Plaintiffs "fail to state a claim upon which relief can be

7   granted" and the motion should be granted as to the entire complaint.

8   **B.    Even if the Doctrine Did Not Apply, A.P.'s Title VI and Rehabilitation Act Claims**
    **Should Be Dismissed Because Defendants are Not Subject to Liability Based on**
9   **Receipt of a PPP Loan in This Instance**

10

11        Even if the Doctrine did not apply here, A.P.'s Title VI claim and his Rehab Act claim

12  still fail because Jesuit's acceptance of an emergency federal Small Business Administration

13  ("SBA") Paycheck Protection Program ("PPP") loan in April of 2020 did not expose Jesuit to

14  liability under those statutes simply because it received federal funds.

15        Title VI of the 1964 Civil Rights Act, 42 U.S.C. §2000d, *et seq.*, provides that "No

16  person in the United States shall, on the ground of race, color, or national origin, be excluded

17  from participation in, be denied the benefits of, or be subjected to discrimination *under any*

18  *program or activity receiving Federal financial assistance*."  (42 U.S.C. §2000d, emph.

19  added.)  As the U.S. Supreme Court has noted, "the voluminous legislative history of Title VI

20  reveals a congressional intent to halt federal funding of entities that violate a prohibition of

21  racial discrimination similar to that of the Constitution."  (*Regents of Univ. of California v.*

22  *Bakke*, 438 U.S. 265, 284 (1978).)  Additionally, §504 of the Rehabilitation Act, 29 U.S.C.

23  §794(a), mandates that "[n]o otherwise qualified individual with a disability in the United

24  States…shall, solely by reason of her or his disability, be excluded from the participation in,

25  be denied the benefits of, or be subjected to discrimination *under any program or activity*

26  *receiving Federal financial assistance…*".  (29 U.S.C. §794(a), emph. added.)  Similar to Title

27  VI, "Congress limited the scope of §504 to those who actually 'receive' federal financial

28  assistance because it sought to impose §504 coverage as a form of contractual cost of the

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-15-

recipient's agreement to accept the federal funds." (*U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986).) Therefore, exposure under both these statutes are contingent upon the receipt of federal funds.

While federal financial assistance can come in many forms, where such assistance comes in the form of SBA financial assistance, the SBA's own nondiscrimination regulations apply. Pursuant to 13 C.F.R. §113.3(a), recipients of SBA financial assistance may not:

> (a) Discriminate with regard to goods, services, or accommodations offered or provided by the aided business or other enterprise, whether or not operated for profit, because of race, color, religion, sex, handicap, or national origin of a person, or fail or refuse to accept a person on a nonsegregated basis as a patient, student, visitor, guest, customer, passenger, or patron.

(13 C.F.R. §113.3-1(h).) [6] Moreover, in an effort to clarify its regulations and the impact those regulations might have on faith-based applicants for PPP loans who may have previously not been subject to such nondiscrimination statutes in the past, the SBA publicizes answers to a number of "Frequently Asked Questions." (See RJN and Fitzsimmons Decl., ¶3, Ex. 2.) [7] In that document, the SBA clarified, among other things, that receipt of a PPP loan would not "(1) limit the limit the authority of religious organizations to define the standards, responsibilities, and duties of membership; (2) limit the freedom of religious organizations to select individuals to perform work connected to that organization's religious exercise; nor (3) constitute waiver of any rights under federal law." (*Id*. at p. 2, FAQ #4.) Additionally, though some organizations might be subject to §113.3, *supra*, "SBA regulations also make clear that these nondiscrimination requirements do not limit a faith-based entity's autonomy with respect to membership or employment decisions connected to its religious exercise. 13 CFR § 113.3-1(h)." (*Id*. at p. 3, FAQ #5.) It went on to clarify that with respect to §113.3-1(h), the SBA regulations "apply with respect to goods, services, or accommodations offered generally to the

---

[6] This subsection of §113.3-1 has never been the subject for judicial scrutiny.

[7] Per Defendants' Request for Judicial Notice, judicial notice of the SBA's FAQ page is appropriate per Fed. R Evid., Rule 201. This Court has, in the past, taken judicial notice of a similar "FAQ" document issued by the U.S. Department of Justice. (See *Morning Star Packing Co. v. S.K. Foods, L.P.*, No. 2:09-CV-00208-KJM, 2015 WL 3797774, at *2 (E.D. Cal. June 18, 2015).) This Court found that judicial notice was warranted because it was readily available on the department's website, and was therefore ripe for judicial notice under Rule 201. (See *ibid.*) the document is made publically available for download at the SBA's website (https://www.sba.gov/document/support-faq-regarding-participation-faith-based-organizations-ppp-eidl)

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
FEDERAL RULE 12(b)(6)                    Case No. 2:21-cv-01347-KJM-KJN

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1   public by recipients of these loans, but not to a faith-based organization's ministry activities

2   within its own faith community."  However, "SBA will not apply its nondiscrimination

3   regulations in a way that imposes substantial burdens on the religious exercise of faith-based

4   loan recipients, such as by applying those regulations to the performance of church ordinances,

5   sacraments, or religious practices."  (*Ibid*.)

6       The only federal funding that Plaintiffs allege Jesuit received is a PPP loan.  (See

7   Compl., ¶11.)  Plaintiffs allege that "[b]y accepting the PPP loan, JHS's activities became

8   regulated by the Small Business Association's anti-discrimination regulations, which prohibit

9   discrimination on the basis of race, color, religion, sex, handicap, age, or national origin.  13

10  C.F.R. §113.3." (*Ibid*.)  As indicated above, however, the SBA regulations explicitly exempt

11  from its nondiscrimination regulations conduct related to "a faith-based entity's autonomy

12  with respect to membership or employment decisions connected to its religious exercise" per

13  13 C.F.R. §113.3-1(h).  Since the conduct alleged in the complaint is directly tied to Jesuit's

14  autonomy with respect to membership – i.e. dismissing a student for failing to adhere to

15  policies grounded in its Christian mission – such conduct is not covered under the SBA

16  regulations, and therefore does not create liability under either federal statute.  Regardless,

17  even delving into whether the Board's decision in this instance constituted "a faith-based

18  entity's autonomy with respect to membership…decisions connected to its religious exercise"

19  requires an inquiry precluded by the Doctrine.

20      Therefore, although Jesuit technically "received" federal assistance in the form of an

21  SBA PPP loan, the SBA's own regulations indicate that its nondiscrimination regulations do

22  not apply to Jesuit.  As the complaint alleges no other basis for Jesuit being subject to either

23  Title VI or the Rehab Act, and therefore does not otherwise show that Defendants were the

24  "recipients" of federal funding (nor can Plaintiffs allege in good-faith in any other basis of

25  federal funding), the allegations in the complaint as they are do not give rise to claims against

26  Defendants under these two federal statutes.

27  / / /

28  / / /

-17-

**C.** **Even if Defendants Could Be Subject to the Federal Statutes Based on Receipt of a PPP Loan, A.P.'s ADA Claim Fails Because Jesuit is Exempt from Title III**

A.P.'s third cause of action is for disability discrimination *under the ADA*. Though the complaint does not explicitly state which Title of the ADA controls his claim here, his cause of action necessarily arises under Title III of the ADA because he asserts disability discrimination and failure to accommodate his disability against a privately owned and operated entity. Title III of the Act prohibits disability discrimination in privately held places of public accommodation. (See 42 U.S.C. §12182(a).) The fundamental elements for a claim under Title III of the ADA for disability discrimination are essentially the same as those under the Rehab Act. However, liability under the ADA is ***not*** predicated on any receipt of government funds. (See *Layman v. Alloway Stamping & Mach. Co.*, 98 F. App'x 369, 374 fn. 1 (6th Cir. 2004) ["the Rehabilitation Act also requires a showing of receipt of government funds-a finding which is not required under the ADA."]; see also *Norfleet v. Gaetz*, 820 F. App'x 464, 469 (7th Cir. 2020) [also recognizing the distinction].) As such, the PPP loan does not affect Jesuit's exposure to the ADA claim.

A.P.'s ADA claim, however, fails to state a cause of action because religious institutions are exempted from the requirement of Title III. Specifically, 42 U.S.C. §12187 states that "[t]he provisions of this subchapter shall not apply… to religious organizations or entities controlled by religious organizations…." (42 U.S.C. §12187.) Title III falls under that subchapter. Additionally, the U.S. Justice Department's regulations specifically identify the §12187 exemption to cover religious *schools*. (See 28 C.F.R. §Pt. 36, App. C.) Federal courts, often citing to the DOJ's regulations for support, have ruled that §12187's exemption extends to religious schools,. (See, e.g. *Sky v. Haddonfield Friends School*, 2016 WL 1260061, at *7 (D.N.J. Mar. 31, 2016); see also *Bethany Powers Sloan v. Community Christian Day School*, LLC, 2015 WL 10437824, at *1-2 (M.D.Tenn. Dec. 11, 2015); *White v. Denver Seminary*, 157 F.Supp.2d 1171, 1173 (D.Colo.2001).) Because receipt of federal assistance is irrelevant under title III of the ADA, and because Jesuit is statutorily exempt from Title III's mandates, A.P.'s third cause of action must also be dismissed.

-18-

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

**D.**   **Plaintiffs Fail to State a Cause of Action Under Any of Their Three Contract-Based Claims**

In addition to A.P.'s federal statutory causes of action, he *and his father* assert three common law causes of action sounding in contract.  The fourth cause of action is for breach of written contract.  In California, the *prima facie* elements for a claim for breach of written contract are "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."  (*Oasis W. Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.)  The fifth cause of action is for breach of an implied-in-fact contract.  "The elements of breach of an implied-in-fact contract are identical to that of an ordinary contract, except that the contract is alleged to have been formed by the conduct of the parties." (*1 Energy Sols., Inc. v. Nicholas Holiday, Inc.*, 2013 WL 12133654, at *2 (C.D. Cal. Nov. 5, 2013).)  Therefore, to determine the existence of such an implied-in-fact contract, a plaintiff must still prove the same elements for the existence of a valid written contract: "mutual assent or offer and acceptance, consideration, legal capacity and lawful subject matter." (*Northstar Financial Advisors Inc. v. Schwab Investments*, 779 F.3d 1036, 1050–51 (9th Cir. 2015).)

The sixth cause of action is for breach of the covenant of good faith and fair dealing.  "Every contract imposes on each party a duty of good faith and fair dealing in performance and enforcement of the contract." (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1393.)  "A breach of the implied covenant of good faith and fair dealing involves something beyond the breach of the contractual duty itself." (*Id.* at 1394 internal quotations omitted.) While a plaintiff may bring claims for both breach of contract and breach of the implied covenant, when both claims rely on the same alleged acts and seek the same relief, the breach of the implied covenant claim may be disregarded as superfluous.  (See *Landucci v. State Farm Ins. Co.*, 65 F.Supp.3d 694, 716 (N.D. Cal. 2014), citing *Guz v. Bechtel Nat'l, Inc.* (2007) 24 Cal.4th 317, 327.)

All three claims arise under the same theory: that Jesuit (the only Defendant against whom these three claims are asserted) entered into a contract with Plaintiffs, failed to

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-19-

perform certain material obligations of that contract while Plaintiffs performed all their contractual obligations or were excused from performance somehow, and that they were damaged.  In the context of breach of contact claims in response to adverse disciplinary decisions by schools, "courts have often deferred to any challenge based in contract to [a school's] academic and disciplinary decisions."  (*Kashmiri v. Regents of Univ. of California* (2007) 156 Cal.App. 4th 809, 824–25.)  Regardless, any ability for Plaintiffs to succeed here requires an initial finding that Jesuit breached the alleged contract, or (as to the good faith and fair dealing claim) wrongfully prevented Plaintiffs from enjoying the benefits of the contract. In other words, even if the Court determines that it can adjudicate these three claims without inquiry into ecclesiastical matters, it would still need to determine whether Jesuit's conduct, in expelling A.P., was a breach of the contract itself: i.e. Jesuit did not have a contractual right to do what it did.

However, the allegations in the complaint, even if taken as true, do not demonstrate any breach on Jesuit's part.  First, the complaint alleges a number of contract provisions.[8]  Most of these alleged "contractual provisions" are not found anywhere in the Exhibit attached to the complaint or the complete version of the Handbook submitted in the Declaration of Marcie Fitzsimmons in support of this motion. (See, e.g., *Rankin v. Global Tel\*Link Corp.*, 2013 WL 3456949, at \*14 (N.D. Cal. Jul. 9, 2013) [dismissing breach of contract claim where breach alleged was not for any express term of the alleged contract].)  Additionally, many of the alleged provisions are especially vague in substance, and "courts have not interpreted general and vague declarations or promises in [school] publications as creating contractual obligations."  (*Kashmiri*, *supra*, 156 Cal.App.4th at 832.)  More importantly, the complaint has no allegations that Jesuit actually breached those provisions, whether they exist

---

[8] The alleged terms in the complaint are as follows:  "(a) that JHS would partner with parents, the students' primary educators, in all facets of student life at JHS; (b) that A.P. would be treated fairly and not discriminated against on the basis of race or disability; (c) that A.P. would be treated with respect and dignity; (d) that discipline would not be imposed in a manner that was capricious, arbitrary, or retaliatory; (e) that parents would be notified of any significant discipline issues; (f) that progressive discipline would be employed and A.P. would be given the opportunity to improve any alleged misconduct; (g) that JHS would accommodate A.P.'s disabilities, not ignore them when considering disciplinary action; and (h) that being educated at JHS would enhance, not cause irreparable harm, to A.P.'s college prospects."  (Complaint, ¶83 (4th cause of action), and ¶90 (5th cause of action).)

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO FEDERAL RULE 12(b)(6)                                          Case No. 2:21-cv-01347-KJM-KJN

1    or not. (See Compl., ¶¶82-85.)

2        Second, the Handbook itself indicates that abidance by the school's policies is a

3    condition of enrollment.  There is no reciprocal language in the handbook that binds Jesuit to

4    adherence to its own policies as a condition for anything.  In other words, in exchange for

5    enrollment, a student must (1) pay his tuition (scholarships aside) and (2) he and his parents

6    must abide by the terms of the school's policies.  That Jesuit is *contractually* bound by its own

7    policies is not supported by the very terms of the handbook itself. (See Fitzsimons Decl., ¶2,

8    Ex. 1, p. 5.)  Therefore, any claim that Jesuit breached a material term of the contract is

9    negated by the contract itself as Jesuit did not take on the contractual burdens alleged.

10       Next, the allegations in the complaint themselves indicate that A.P. and his father did

11   not fully perform their obligations under the contract.  For example, the (full) handbook

12   announces a zero-tolerance policy towards harassment, the nature of which may pertain to, but

13   is not limited to, "an individual's race, creed, color, national origin, culture, gender,

14   appearance, mannerisms, *sexual orientation*, physical or *mental disability*."  Substantiated acts

15   of harassment "will result in disciplinary action up to and including the dismissal of a student

16   and, for an employee, immediate termination."  (*Id.* at p. 4.)  **A.P. admitted using the**

17   **homophobic slur "fag."**  (Compl., ¶41, ¶44.)  Part of the reason he was dismissed was for use

18   of that word. [9]  Additionally, A.P. admits in his complaint that he "once" used the term

19   "retarded."  Not only does this violate the previous policy stated above, but it also constitutes

20   "insensitive speech" which is defined as "written words, spoken words, images or gesturing

21   that is offensive to one or more persons."  (See Fitzsimons Decl., ¶2, Ex. 1, p. 32.)  Dismissal

22   is a potential punishment for such insensitive speech.  (*Ibid.*)

23       The Handbook clearly rests all disciplinary decisions with Jesuit, all decisions as to

24   what constitutes disciplinary decisions with Jesuit, and an unfettered right to change its

25   policies whenever and however it chooses.  Plaintiffs have failed to demonstrate in their

26   _____

27   [9] While the complaint does not outright admit A.P. used the racist slur for which he was ultimately dismissed, he
     does not deny it either, and part of his race discrimination claim implicitly admits using the word because his
     disparate treatment claim is premised on the fact that another student of a different race *also used racist language*
28   and was not subjected to the same discipline.  Moreover, A.P. repeatedly defends himself by alleging that he never
     "directed the N-word at or using it to refer to a person." (See Complaint, ¶44.)

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
FEDERAL RULE 12(b)(6)                                    Case No. 2:21-cv-01347-KJM-KJN

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

complaint any actual breach on Jesuit's part.  Moreover, they admit that they did not fully perform.  To win on any of the contract-based claims, Plaintiffs would have to show that despite all of these rights, and despite A.P.'s admitted use of homophobic slurs, slurs related to disabilities, and an implicit admission of using racist slurs, Jesuit had no right under an express or implied contract to discipline A.P. in the manner alleged.  Neither the allegations in the complaint nor the contractual language itself, attached to the complaint, could ever support such a conclusion.  As such, all three contract based claim must fail.

**E.    Plaintiffs Fails to Allege Standing to State a Claim Under the UCL**

California Business & Professions Code §17200, the Unfair Competition Law ("UCL"),  prohibits any "unlawful, unfair or fraudulent business act or practice."  In order to have standing to bring a UCL claim, a party must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that that economic injury was the result of, i.e., caused by, the unfair business practice…"  (*Kwikset Corp. v. Superior Ct.* (2011) 51 Cal.4th 310, 322.)

Even if the court determines that it can adjudicate the claim without inquiring into ecclesiastical matters to determine if the conduct alleged constitutes a "business practice", the claim fails because Plaintiffs lack standing under the statute.  There is no allegation in the complaint that either A.P. or his father suffered any injury-in-fact in the form of a loss of money or property as a result of any alleged unfair business practice.  As such, this claim fails as a matter of law.

**F.    Plaintiffs Fail to Demonstrate Extreme and Outrageous Conduct Sufficient to State a Claim for IIED**

To state a cause of action for IIED, a plaintiff must demonstrate "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress." (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903.)  The conduct alleged must be "so extreme as to exceed all bounds of that usually tolerated in a civilized community."  (*Ibid.*)

-22-

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1   Liability for IIED "does not extend to mere insults, indignities, threats, annoyances, petty

2   oppressions, or other trivialities," but only to conduct so extreme as "to go beyond all possible

3   bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

4   community." (*Alcorn v. Anbro Eng'g, Inc.* (1970) 2 Cal.3d 493, 499 n.5.)  "[I]t is for the court

5   to determine, in the first instance, whether the defendant's conduct may reasonably be regarded

6   as so extreme and outrageous as to permit recovery." (*Tollefson v. Roman Catholic Bishop*

7   (1990) 219 Cal.App.3d 843, 858, citation and internal quotation marks omitted.)  Severe

8   emotional distress must be "emotional distress of such substantial quality or enduring quality

9   that no reasonable [person] in civilized society should be expected to endure it."  (*Hughes v.*

10  *Pair* (2009) 46 Cal.4th 1035, 1051.)  "[D]istrict courts applying California law have held that

11  conclusory allegations without details about the distress are insufficient to state a claim."

12  (*C.H. v. Brentwood Union Sch. Dist.*, 2021 WL 3271169, at *5 (N.D. Cal. July 30, 2021).)

13  The IIED claim fails for several reasons.

14      Foremost, the complaint fails to specify what conduct constituted extreme and

15  outrageous conduct.  To the extent A.P. claims that he was subjected to extreme discipline for

16  "allegedly using offensive language," and that A.P. "adamantly denied directing the N-word at

17  or using it to refer to a person," he does not deny that he used the word, or that the allegations

18  against him were false.  Second, there again seems to be the implication that not only were his

19  learning disabilities "dismissed as irrelevant" but that somehow failing to account for such

20  disabilities impacted the final decision to separate.  Again, as discussed above, there are

21  simply no allegations whatsoever that A.P's learning disabilities (1) caused his misconduct, (2)

22  impacted his defense, or (3) caused the Board to rule against him where it ordinarily would not

23  have done so.  Other courts have found *indifference* to disability as *insufficient* to state a claim

24  for IIED.  (See, e.g., *Johnson v. Chapman University*, 2021 WL 3463897, at *3 (C.D.Cal. Apr.

25  1, 2021) [finding that the school telling a disabled plaintiff to "toughen up" and to "overcome"

26  the need for accommodations, and ignoring her need for accommodations, while possibly

27  insulting and insensitive, did not amount to extreme and outrageous conduct.])  Here, as

28  discussed above, there is no allegation that A.P. even raised the issue of his disability during

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
FEDERAL RULE 12(b)(6)                            Case No. 2:21-cv-01347-KJM-KJN

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1   the hearing; he only alleges that his mother vaguely referenced it the next day. (Compl., ¶55.)

2       Third, the claim also seems to be grounded in the "hostile cross-examination by school

3   authorities for an hour and 20 minutes, culminating with the school principal humiliating him

4   by labeling him a bigot, a racist, and an unrepentant sinner."  However, as noted above,

5   extreme and outrageous conduct must go beyond "mere insults, indignities, threats,

6   annoyances, petty oppressions, or other trivialities."  Even accepting A.P.'s allegations

7   regarding Principal Wood's conduct at the hearing as true, such conduct has been found to be

8   insufficient to state a claim for IIED in the past.  (See, e.g., *Corales v. Bennett*, 488 F.Supp.2d

9   975, 988 (C.D.Cal. May 21, 2007) [finding that an assistant vice-principal's "actions in

10  lecturing the students may have been more forceful and harsh than called for under the

11  circumstances, but those actions fall far short of the type of outrageous conduct necessary to

12  support a claim for intentional infliction of emotional distress."]; see also *Rashdan v.*

13  *Geissberger*, 2011 WL 197957, at *10-11 (N.D.Cal Jan. 2014), [allegations insufficient to

14  state IIED claim where the plaintiff alleged being humiliated in her classes in front of other

15  students, faculty and her mother, having her transcript manuipulated, being told four days

16  before graduation that she was ineligible, being denied an explanation for her inability to

17  graduate.] [10]

18      As a final note, this cynical and dark cause of action must be exposed for what it is: an

19  attempt to recover large, unquantifiable sums of money by alleging that the school's and Mr.

20  Wood's display of outrage *in the face of one of their student's cavalier and unrepentant use of*

21  *racist, homophobic and disability-related slurs* is itself somehow "extreme and outrageous."

22  To find such conduct "extreme and outrageous", both as a matter of law and as a matter of

23  public policy, would deter efforts by educators to maintain order and discipline at their

24  schools, and would endorse A.P.'s reprehensible conduct for others in the future, providing

25  them with a legal weapon against any institution that seeks to combat such bigotry.  As the

---

[10] Though in the somewhat analogous employment termination context, see also *Buscemi v. McDonnell Douglas Corp.*, 736 F2d 1348, 1352 (9th Cir. 1984) [not outrageous where plaintiff was allegedly fired on a pretext, without cause and in a "callous and insensitive manner"]; *Trerice v. Blue Cross of Calif.* (1989) 209 Cal.App.3d 878, 883 [not outrageous where the plaintiff was allegedly offered a termination package that she accepted but the offer was then withdrawn and plaintiff was demoted and "forced" to work at a menial job before she was ultimately fired]

-24-

conduct alleged does not even come close to "extreme and outrageous," the claim, even without recourse to the Doctrine, must fail.

## V.   CONCLUSION

For the forgoing reasons, Defendants respectfully requests that this Court dismiss this action with prejudice pursuant to Fed. R Civ. P, Rule 12(b)(6).  Because Plaintiffs cannot possibly amend in good-faith to address the deficiencies in the Complaint, Plaintiffs should not be granted leave to amend

Dated: September 3, 2021                     GORDON REES SCULLY MANSUKHANI, LLP


                                             By:   */s/* Marcie Isom Fitzsimmons
                                                    Marcie Isom Fitzsimmons
                                                    Danny A. Barak
                                                    Attorneys for Defendants
                                                    JESUIT HIGH SCHOOL OF
                                                    SACRAMENTO, JOHN P. MCGARRY,
                                                    S.J., and MICHAEL WOOD, Ed.D.

**Gordon Rees Scully Mansukhani, LLP**
275 Battery Street, Suite 2000
San Francisco, CA 94111

1246409/61054966v.1

-25-